APRIL D. BAKER, an Infant, by BEVERLY BAKER, Her Mother and Natural Guardian, et al., Respondents, v ST. AGNES HOSPITAL et al., Defendants; ELI LILLY AND COMPANY, Appellant.

Second Department, October 29, 1979

### APPEARANCES OF COUNSEL

*Dewey, Ballantine, Bushby, Palmer & Wood (Steven C. Kany, Thomas C. Mazza* and *Kenneth Thomas* of counsel), for appellant.

*Katz, Shandell, Katz & Erasmous (Richard E. Shandell* of counsel), for respondents.

### OPINION OF THE COURT

MOLLEN, P. J.

In this combined medical malpractice and products liability action, the defendant Eli Lilly and Company (Lilly) appeals from the denial of its motion for summary judgment. The question presented concerns the nature of a pharmaceutical manufacturer's obligation to make known the dangers of a drug it supplies.

The drug involved in this case is Dicumarol, an anticoagulant used in the treatment of blood clotting disorders including phlebitis. Dicumarol has been produced by Lilly since 1944 when its new drug application was first approved by the Food and Drug Administration.

By 1963, following substantial controversy, it became generally accepted in the medical community that Dicumarol

crossed the placental barrier and therefore posed a serious risk to the fetus when given to a pregnant woman. Consequently, in 1964, Lilly amended its package insert for Dicumarol to include a "warning" that "[w]hen pregnant women are treated with this drug, fetal bleeding diathesis *may* occur and cause fetal death *in utero.*"[1] This statement continued to appear in the package inserts until 1970 when the National Academy of Sciences/National Research Council issued its efficacy report on Dicumarol. The report strongly recommended that the risk of fetal hemorrhage be stressed and that Heparin be considered the drug of choice whenever anticoagulant therapy is required for the pregnant patient. In response to the report, Lilly again amended and strengthened the language of its package insert to read: "Dicumarol passes the placental barrier. When pregnant women are treated with the drug, fetal bleeding diathesis *may* occur and cause fetal death *in utero.* Dicumarol is also secreted in the maternal milk. Therefore, the drug is contraindicated for pregnant patients and for breastfeeding mothers. If anticoagulant therapy is required for such patients, heparin is considered the drug of choice, because it does not pass through the placenta or into the mother's milk."

The change in language was significant because the insert now contained a "contraindication" rather than merely a "warning". A "warning" usually relates to circumstances under which a drug may bring about a dangerous condition or side effect. A physician will consider the warning in weighing the risks and benefits of a drug for a particular patient. In contrast, a "contraindication" refers to a circumstance under which the drug must never be given. It is absolute and admits of no exceptions.

The statement of contraindication appeared in Lilly's package inserts at the time the instant cause of action arose.

As an additional measure, Lilly, for a time, published information on Dicumarol in the Physician's Desk Reference (PDR), the compendium often relied upon by physicians to obtain knowledge of the proper uses and hazards of drugs. From 1964 through 1966, Lilly's PDR advertisement on Dicumarol stated, *inter alia,* that the drug "is probably contraindicated during pregnancy." In 1967, however, the contraindica-

---

1. As the name suggests, a package insert is the legally required document which the manufacturer includes in the drug package.

tion was deleted and replaced by a "warning" concerning the possibility of fetal bleeding diathesis and fetal death *in utero.* The next year, Lilly inexplicably withdrew its PDR statement entirely. Hence, by the autumn of 1972, Lilly included a contraindication for pregnant women in its Dicumarol package inserts, but published no corresponding statement of any sort in the PDR or any other reference work.

On October 6, 1972 plaintiff Beverly Baker was admitted to the defendant United Hospital suffering from phlebitis. Defendant Mallory, her physician, prescribed Dicumarol. He had earlier confirmed Ms. Baker's suspicions that she was pregnant.

At the hospital, Ms. Baker received Dicumarol supplied to the hospital's dispensary by defendant Abbott Laboratories. On October 29 Ms. Baker was discharged but continued taking Dicumarol as an outpatient, obtaining the drug from an outside pharmacy pursuant to a prescription written by Dr. Mallory. The Dicumarol thus obtained was manufactured and distributed by Lilly.

In April, 1973 Ms. Baker was delivered of a child, the infant plaintiff April Diane Baker. The child was born with severe and irreparable birth defects including brain damage and partial paralysis. Thereafter, this action was brought charging two hospitals and four physicians with medical malpractice, and seeking damages from three pharmaceutical manufacturers, including Lilly, on theories of product liability. It was alleged, and for purposes of this appeal is undisputed, that the birth defects resulted from bleeding in the fetal brain caused by Ms. Baker's ingestion of Dicumarol.

At an examination before trial, Dr. Mallory testified that when he prescribed the Dicumarol he was unaware that it could cross the placental barrier and pose a threat to the fetus. He had never before prescribed the drug for a pregnant patient and had not read anything about the drug for the preceding five years. He did not consult the package insert or any other source of information on Dicumarol before ordering it for Ms. Baker.

Based upon Dr. Mallory's testimony and upon the contents of its own package inserts, Lilly moved for summary judgment dismissing the complaint as against it. Special Term denied the motion finding that "[i]ssues of fact exist, at least with respect to the adequacy of the warnings relating to the drug

in question, which can only be resolved by a trial." Lilly now appeals from the order denying summary judgment.

■ There should be an affirmance.

Essentially, Lilly advances two arguments on this appeal. First, Lilly contends that its package inserts adequately warned of the dangers of Dicumarol and, therefore, it cannot be held liable for the misuse of the drug by a physician who disregarded the warning. Second, Lilly maintains that, in any event, any inadequacy in its warning could not have been a proximate cause of the infant plaintiff's injuries in view of Dr. Mallory's admitted failure to consult any of the available reference material on Dicumarol before prescribing it for Ms. Baker.

We reject these arguments because they misperceive the nature of a drug manufacturer's obligation to make known the potential hazards of its products.

■ Plaintiffs frame their action against Lilly in terms of strict products liability. Such an action has been recognized in New York since at least 1973 when *Codling v Paglia* (32 NY2d 330) was decided. In that case, the Court of Appeals put to rest forever the need for privity and proof of specific acts of negligence in an action alleging injury caused by a defective product. As Judge JONES observed for the court *(supra,* p 340): "Today as never before the product in the hands of the consumer is often a most sophisticated and even mysterious article. Not only does it usually emerge as a sealed unit with an alluring exterior rather than as a visible assembly of component parts, but its functional validity and usefulness often depend on the application of electronic, chemical or hydraulic principles far beyond the ken of the average consumer. Advances in the technologies of materials, of processes, of operational means have put it almost entirely out of the reach of the consumer to comprehend why or how the article operates, and thus even farther out of his reach to detect when there may be a defect or a danger present in its design or manufacture. In today's world, it is often only the manufacturer who can fairly be said to know and to understand when an article is suitably designed and safely made for its intended purpose."

These considerations plainly apply with equal force in a case of drug-induced injury. (Cf. *Bichler v Willing,* 58 AD2d 331.) A person seeking medical care entrusts his well-being, and often his life, to the hands of his physicians. He generally

knows little of the nature of his illness and even less of the appropriate treatment. When medication is required, the average patient's reliance on others necessarily becomes absolute. A drug represents nothing more to him than a mysterious chemical which, he is told, will improve his condition. He almost never has any understanding of how the improvement will be brought about or of what actual effect the drug will have on his body.

■ Moreover, even the physician upon whom the patient most directly relies may himself lack a complete knowledge of the potential hazards of each of the myriad of drugs at his disposal. Standards of competent medical care require the physician to obtain such knowledge before administering the drug, but he likewise must rely on others to provide the information in the first instance. This responsibility properly falls most heavily on the manufacturer who stands in the best position to recognize and cure defects (see *Micallef v Miehle Co.,* 39 NY2d 376, 385), and the law generally acknowledges the physician's right to rely on the drug manufacturer's representations concerning its own products. (See, e.g., *Gielskie v State of New York,* 18 Misc 2d 508, 511, revd on other grounds 10 AD2d 471, affd 9 NY2d 834; *Wechsler v Hoffman-La Roche, Inc.,* 198 Misc 540, 542; *Tinnerholm v Parke, Davis & Co.,* 285 F Supp 432, 451, mod on other grounds 411 F2d 48.)

■ Accordingly, it is now well established that "a drug manufacturer is under a duty to warn the medical profession of dangers inherent in its biological drugs which, in the exercise of reasonable care, it knew or should have known to exist" *(Tinnerholm v Parke, Davis & Co.,* 285 F Supp 432, 451, *supra).* (See, also, *Parke, Davis & Co. v Stromsodt,* 411 F2d 1390; *Sterling Drug v Cornish,* 370 F2d 82; *McEwen v Ortho Pharm. Corp.,* 270 Ore 375; *Stevens v Parke, Davis & Co.,* 9 Cal 3d 51; *Krug v Sterling Drug,* 416 SW2d 143 [Mo]; *Tampa Drug Co. v Wait,* 103 So 2d 603 [Fla].)

■ The duty to warn assumes great significance in a products liability case involving pharmaceuticals. If the drug is pure and accompanied by adequate warnings, the manufacturer may not be liable. (See *Incollingo v Ewing,* 444 Pa 263.) On the other hand, notwithstanding the purity of the drug, a breach of the duty to provide adequate warnings renders the drug unreasonably dangerous and therefore unfit. In such circumstances, it becomes a defective product for the purposes

of strict products liability. (See *Davis v Wyeth Labs.,* 399 F2d 121, 130; Restatement, Torts 2d, § 402 A, Comments *h, j, k;* 2 Frumer and Friedman, Products Liability, § 16A [4], [e].)

At bar, Lilly claims to have fulfilled its duty to warn by having detailed the dangers of Dicumarol in its package inserts. Those inserts did in fact warn of the possibility of fetal bleeding diathesis and fetal death *in utero,* and unequivocally stated that Dicumarol was contraindicated for pregnant patients. Indeed, plaintiffs themselves concede that Lilly's package insert warning was "adequate, wholly proper and precisely that which is required." Our inquiry, however, cannot end there for, no matter how detailed and accurate, an uncommunicated warning is no warning at all.

■ We hold, therefore, that the continuing obligation of a drug manufacturer is twofold. First, it must keep abreast of knowledge of its products as gained through research, adverse reaction reports, scientific literature and other available methods. (See *Schenebeck v Sterling Drug,* 423 F2d 919, 922; *McEwen v Ortho Pharm. Corp.,* 270 Ore 375, *supra; cf. Micallef v Miehle Co.,* 39 NY2d 376, 386, *supra.)* Second, and equally important, it must take such steps as are reasonably necessary to bring that knowledge to the attention of the medical profession. (See *Sterling Drug v Yarrow,* 408 F2d 978; *McEwen v Ortho Pharm. Corp., supra; Krug v Sterling Drug,* 416 SW2d 143 [Mo] *supra;* see, also, Rheingold, Products Liability—The Ethical Drug Manufacturer's Liability, 18 Rutgers U L Rev 947, 993 ["it is incumbent upon the manufacturer to bring the warning home to the doctor"].) The greater the potential hazard of the drug, the more extensive must be the manufacturer's efforts to make that hazard known to the medical profession. (Cf. *Micallef v Miehle Co., supra,* p 386.)

In the case at bar, when Ms. Baker received the Dicumarol, Lilly utilized only package inserts to convey information concerning the drug. As noted, package inserts are included within the drug package when it is shipped to the pharmacy. The pharmacist, however, often removes and discards the insert in the process of affixing his own gummed label to the actual container. There is no system for insuring, or even making it likely, that the physician sees the insert. (See Dixon, Drug Product Liability, § 6.10 [4].) Consequently, "[m]any prescribing physicians would not come into contact with package inserts or warning labels attached to the drug

when the pharmacist filed the prescription" *(Stevens v Parke, Davis & Co.,* 9 Cal 3d 51, 67, *supra).*

There are other, well-known methods by which pharmaceutical manufacturers apprise the medical profession of the dangers of a drug. One is the PDR which Lilly used for a time and then unaccountably abandoned.[2] Others include so-called "Dear Doctor" letters addressed to physicians, notices in medical journals, and the use of "detail men" who call upon physicians personally to present them with information concerning pharmaceuticals. (See, e.g., *Sterling Drug v Yarrow,* 408 F2d 978, 987, 992-993, *supra;* Dixon, Drug Product Liability, § 3.05.) Lilly allegedly availed itself of none of these.

The potential danger of Dicumarol is extremely grave. It can cause the death of a fetus *in utero* and can leave a newborn with severe and lifelong injury. In view of the seriousness of these hazards, we decline to hold that, as a matter of law, Lilly's decision to limit its warning to its package inserts was reasonable and therefore sufficient.

Nor can we conclude on this record that, had Lilly chosen to employ other, more effective means of communicating its warning, Dr. Mallory would nevertheless have remained unaware of the dangers inherent in Dicumarol. This is not a case where the physician deliberately disregards the manufacturer's warning in favor of his own supposed knowledge of the drug. (See *Mulder v Parke, Davis & Co.,* 288 Minn 332; *Douglas v Bussabarger,* 73 Wn 2d 476, 478; *Perluisi v Squibb & Sons,* 440 F Supp 691.) Here, the physician was simply unaware of information contained in available literature, and such does not rise to the level of an intervening cause of the injury. (See, e.g., *Torsiello v Whitehall Labs.,* 165 NJ Super 311 [398 A2d 132, 140]; *Sterling Drug v Cornish,* 370 F2d 82, 85, *supra.)*

Moreover, the physician's failure to search the literature can hardly be described as an unforeseeable circumstance. And it was observed more than a quarter century ago that "[t]he claim that a hazard was not foreseen is not available to one who did not use foresight appropriate to his enterprise"

2. It has been repeatedly suggested that a compendium more authoritative and complete than the PDR be compiled for the use of physicians. Indeed, Federal legislation mandating such a compendium has been proposed in Congress. (See Gardner, Increasing Patient Awareness in Drug Therapy: Ramifications of a Patient Package Insert Requirement, 66 Georgetown L Rev 837, 839, n 8.)

*(Dalehite v United States,* 346 US 15, 52, JACKSON, J., dissenting).

We agree with Special Term that the adequacy of Lilly's warnings presents a question of fact to be determined at trial. (See *Basko v Sterling Drug,* 416 F2d 417, 426; *Hoffman v Sterling Drug,* 485 F2d 132, 142.) Accordingly, the order appealed from should be affirmed.

HOPKINS, DAMIANI and TITONE, JJ., concur.

Order of the Supreme Court, Westchester County, entered March 13, 1978, affirmed, with $50 costs and disbursements.