OPINION OF THE COURT
David B. Saxe, J.
I. INTRODUCTION
In a recent strict product liability case that was tried before me and a jury, the applicability of New York’s "informed intermediary doctrine”, requiring a pharmaceutical manufacturer to warn only the prescribing physician and not the ultimate user of the side effects and possible risks of prescription drugs was at issue.
I considered the rationale for this doctrine and case authority from this and other jurisdictions, and, based upon the facts of this case, I refused to apply the informed intermediary doctrine. So, I charged the jury that the defendants, all pharmaceutical manufacturers, had a duty to warn the plaintiff, as well as physicians, of the known side effects and possible risks of their vaccine. Since this legal instruction was one of first impression in this State, I have decided to explain my reasoning in this decision.
Additionally, following a special verdict in favor of the defendants, the plaintiffs moved for an order pursuant to *177 CPLR 4404 (a) to set aside the verdict and to grant a new trial. The disposition of that motion is also considered here.
With respect to the motion, the plaintiffs first contend that although the court correctly instructed the jury that the defendants had a duty to warn the plaintiff directly, the admission of certain testimony contradicted this charge.
Second, the plaintiffs contend that the court’s charge on causation was wrong and confused the jury.
Finally, the plaintiffs argue that they were denied a fair trial due to juror misconduct.
II. FACTS
In 1981, the plaintiff, Robert Samuels, a 44-year-old man with a wife and one son, was employed by Texaco, Inc. as the editor of its in-house publication, the Texaco Star. During the fall of 1981, Mr. Samuels was assigned to take a trip visiting Texaco facilities in Hong Kong, Indonesia, Singapore, Australia and India.
On September 28, 1981, in preparation for his trip, Mr. Samuels received a tetanus toxoid vaccine and a typhoid vaccine. On October 5, 1981, Mr. Samuels received a cholera vaccine.[1] The three vaccines were administered at the Texaco Health Services Division in Harrison, New York.
Mr. Samuels did not experience any immediate side effects from these vaccines and remained active and in good health until Thanksgiving of 1981, at which time he had experienced a mild upset stomach lasting two days.
On the evening of December 1, 1981, Mr. Samuels began feeling tired and had some trouble climbing stairs. The next morning, he had difficulty getting out of bed and to work. At about 7:00 a.m., he drove to Nyack Hospital. During the next several hours, his condition deteriorated rapidly, and by the morning of December 3, 1981, Mr. Samuels was unable to breathe on his own and was totally paralyzed. He was diagnosed as suffering from Guillain-Barré Syndrome (GBS), a cell mediated autoimmune disease which is believed to be triggered by viral infections or vaccinations. GBS is a disorder of the peripheral nervous system which, in its most severe form, can result in permanent paralysis or, in some cases, death.
Approximately a week after being hospitalized, Mr. Samuels was transferred to Columbia Presbyterian Hospital where he *178 spent approximately 10 months. In June of 1982, he remained completely paralyzed from his shoulders to his toes and continued to rely on a respirator. Although his recovery was slow, by September, although still paralyzed, he was able to communicate verbally and he was not dependent on a respirator.
In September of 1982, Mr. Samuels was transferred from Columbia Presbyterian to Helen Hayes Hospital for rehabilitation. After being informed that he could expect no further recovery, he was transferred to the Rusk Institute in New York City. After slow but steady progress, Mr. Samuels was discharged from the Rusk Institute on April 21,1985.
Mr. Samuels requires full-time nursing care and continues to undergo therapy at the out-patient center at Rusk. He is able to walk with assistance, but remains confined to a wheelchair and his hands and fingers are weak and practically nonfunctional.
Those employed at the Texaco Health Services Division involved in the administration of vaccines are Dr. Eugene R. Stanton, Texaco’s chief medical officer and the administrator of the facility; Dr. Henry Doyle, associate chief medical officer; and two registered nurses.
The registered nurses administer vaccinations under a "general authorization” provided by Dr. Stanton. Under this authorization, the nurses determine what vaccines are necessary or appropriate and administer them.[2]
It is the policy at the Texaco facility to inform employees of possible local or systemic reactions which may result from vaccinations. Information concerning potential neurological complications associated with the vaccines (such as GBS) is not provided.
The practice of not informing patients of these possible complications was followed at the time Mr. Samuels received his vaccines despite the fact that Dr. Stanton was aware of reports of a wide variety of neurological disorders following the injection of biological products. Also, the cholera vaccine was accompanied by an insert stating that "post-vaccinal neurological disorders[,] although they are uncommon, have *179 been reported following the injection of almost all biological products”.
Mr. Samuels received his vaccines from the registered nurses who only advised him that he might experience a local or systemic reaction such as soreness or a slight fever. And, although at least one of the physicians was present at the facility, neither doctor consulted with Mr. Samuels concerning the vaccine. Moreover, none of these vaccines were "required” either by the foreign countries Mr. Samuels planned to visit or by his employer, Texaco, Inc.
III. THIS ACTION
The plaintiffs, Robert Samuels and his wife, Ricki Samuels, have brought this strict liability action against the alleged manufacturers of the three vaccines he received at the Texaco facilities.[3]
The tetanus toxoid vaccine was allegedly manufactured by Lederle Division of American Cyanamid (Lederle); the typhoid vaccine by Wyeth Laboratories; the cholera vaccine by Sclavo, Inc. The plaintiffs contended that the defendants failed to give adequate warnings of the risk of GBS to the "health care provider”. Additionally, the plaintiffs maintained that the defendants had a duty to warn Mr. Samuels directly of this risk, and having failed to do so, were strictly liable for the plaintiffs’ injuries. Finally, Mr. Samuels contends that if the risk of GBS had been known or communicated to him he would have declined the vaccinations.
Following a seven-week jury trial, a special verdict was rendered in favor of the defendants. The jury found that although the defendants had manufactured the vaccines, the plaintiffs had not proven by a preponderance of the evidence that one or more of the vaccines had caused the GBS and that only defendant Lederle had failed to reasonably and adequately warn Mr. Samuels of the risks of its vaccine.[4] However, the jury concluded that Lederle’s failure to warn the plaintiff of the risks of GBS was not the proximate cause of Mr. Samuels’ injury.
In support of the present motion to set aside the jury’s verdict and grant a new trial, the plaintiffs assert that the *180 admission of Dr. Stanton’s testimony to the effect that he does not now warn patients of the risks of contracting neurological disorders from vaccines "resurrected the 'learned intermediary’ principle which the court had rejected.” The plaintiffs point to the jury’s request to have this specific testimony reread after they had retired in support of their contention that the jury had "misunderstood or overlooked the court’s finding that there was a duty to warn Bob Samuel’s [sic] directly.”
Alternatively, the plaintiffs contend that this court erred in instructing the jury that the plaintiffs must have proven by a preponderance of the evidence both that one of the three vaccines "caused” his GBS and also that the pharmaceutical defendants’ failure to reasonably and adequately warn the plaintiff was a "proximate cause” of Mr. Samuels’ injury. The plaintiffs maintain that "splitting causation into two issues was confusing and unwarranted,” and the court’s failure to employ a unified "substantial factor” charge was error. For the reasons discussed below, the plaintiffs’ motion is denied.
At trial, this court was compelled to consider the applicability of the informed intermediary doctrine. Because few cases have arisen involving departures from the informed intermediary doctrine, no clear legal rule has evolved to explain when an exception to this doctrine is appropriate. But, before considering a departure from this rule, it is important to consider the background and justification for the informed intermediary doctrine.
rv. DUTY TO WARN THE ULTIMATE CONSUMER IN STRICT LIABILITY
ACTIONS
The doctrine of strict products liability for defective products was first recognized in New York in the seminal case, Codling v Paglia (32 NY2d 330 [1973]). Judge Jones observed in Codling that (p 340): "Advances in the technologies of materials, of processes, of operational means have put it almost entirely out of the reach of the consumer to comprehend why or how the article operates, and thus even farther out of his reach to detect when there may be a defect or a danger present in its design or manufacture.”
Today in New York, a cause of action may lie in strict products liability when a manufacturer knows or has reason to know that the product it produces is likely to be dangerous when used for the purpose for which it is supplied, and warnings for the use of the product are absent or inadequate. *181 (See, Robinson v Reed Prentice Div. of Package Mach. Co., 49 NY2d 471, 478-479 [1980]; see, Young v Elmira Tr. Mix, 52 AD2d 202, 204-205 [1976].)
Strict products liability is especially applicable in the production of pharmaceuticals. "When medication is required, the average patient’s reliance on others necessarily becomes absolute * * * He almost never has any understanding * * * of what actual effect the drug will have on his body.” (Baker v St. Agnes Hosp., 70 AD2d 400, 405 [1979]; see also, Restatement [Second] of Torts § 402A comment k [1965].)
Thus, ethical or prescription drugs, although properly manufactured, may be " '[unavoidably unsafe products’ ”, due to potential side effects, but are not considered defective or unreasonably dangerous when accompanied by proper directions for use and adequate warnings of potential hazards. (Wolfgruber v Upjohn Co., 72 AD2d 59, 61 [1979], citing Restatement [Second] of Torts § 402A comment k; Lindsay v Ortho Pharm. Corp., 637 F2d 87, 90 [2d Cir 1980].) A pharmaceutical manufacturer’s duty to warn of all potential dangers of which it knows or should know is continuous and the manufacturer must remain up-to-date on the current status of its product. (Baker v St. Agnes Hosp., supra; Lindsay v Ortho Pharm. Corp., supra, at p 91.)
In New York, the manufacturers of prescription drugs ordinarily have a duty to warn only physicians because they are considered to be "informed intermediaries” between the manufacturer and the patient. (Wolfgruber v Upjohn Co., supra; Baker v St. Agnes Hosp., supra; Lindsay v Ortho Pharm. Corp., supra.) This doctrine is justified on the grounds that the patient relies on the physician’s judgment, whose role is "to evaluate a patient’s needs, assess the risks and benefits of available drugs and then prescribe a drug, advising the patient of its risks and possible side effects”. (Wolfgruber v Upjohn Co., supra, p 61.) And, "[t]he choice [the physician] makes is an informed one, an individualized medical judgment bottomed on a knowledge of both patient and palliative.” (Reyes v Wyeth Labs., 498 F2d 1264, 1276 [5th Cir 1974], cert denied 419 US 1096 [1974].)[5]
*182 Some courts have found that not all circumstances justify the adoption of the informed intermediary doctrine. In Davis v Wyeth Labs. (399 F2d 121 [9th Cir 1968]), the plaintiff allegedly contracted polio from defendants’ polio vaccine administered by a pharmacist at a public clinic. The court held (p 131) that since the vaccine was "dispensed * * * at mass clinics without an individualized balancing by a physician of the risks involved * * * it is the responsibility of the manufacturer to see that warnings reach the consumer”.
In Reyes v Wyeth Labs, (supra), the Fifth Circuit reached a similar result despite the fact that the polio vaccine was administered as part of an ongoing governmental program (rather than a mass immunization) and that a registered nurse administered the vaccine (as opposed to a pharmacist). Since the manufacturer had reason to know that the vaccine was "dispensed without the sort of individualized medical balancing of the risks to the vaccinee that is contemplated by the prescription drug exception”, it was under a duty to warn the plaintiff of the dangers inherent in its vaccine. (498 F2d 1264, 1277, supra.)
The Reyes court also held that a drug manufacturer is held to a standard of expertise which includes a "familiarity with practices and knowledge common in the drug industry as to distribution and administration of pharmaceutical products”. (Reyes v Wyeth Labs., supra, p 1277.) Under this criteria, the court found that the defendants knew or had reason to know that the Sabin vaccine was commonly administered without an "individualized medical judgment’ of the vaccinee’s needs or susceptibilities”, and accordingly, the court refused to apply the informed intermediary rule. (Supra, at p 1277, citing Davis v Wyeth Labs., supra; see also, Williams v Lederle Labs., Div. of Am. Cyanamid Co., 591 F Supp 381, 389.)
The reasoning of Davis v Wyeth Labs, (supra), and Reyes v Wyeth Labs, (supra), has been followed in various swine-flu and polio vaccination cases. (See, e.g., Petty v United States, 740 F2d 1428 [8th Cir 1984]; Unthank v United States, 732 F2d 1517 [10th Cir 1984].) These cases also involved immunizations administered pursuant to large scale programs as opposed to the arguably different situation here where the vaccine was administered at a company clinic.
In Stanback v Park Davis & Co. (657 F2d 642 [4th Cir 1981]), the plaintiff allegedly contracted GBS as a result of a flu vaccine she had received from her doctor. The court *183 reasoned that since the vaccine was not administered in a "massive, nationwide immunization program in which it would have been foreseeable * * * that large numbers of flu vaccines would be dispensed without a physician’s consideration of individual needs and circumstances”, the pharmaceutical manufacturer had no duty to warn the ultimate consumer. (Supra, at p 647.)
However, in Givens v Lederle (556 F2d 1341 [5th Cir 1977]), the court determined that although the polio vaccine was administered directly to the plaintiff’s daughter by her pediatrician in his office,[6] the pharmaceutical manufacturer had a duty to warn the consumer. This holding was based on the court’s observation that: "[t]here is solid evidence that the vaccine was administered here in a manner more like that at a small county health clinic, as in Reyes, [rather] than by prescription” (supra, at p 1345).[7]
The problem with the focus of these cases is that they place undue reliance on the type of program or the physical facilities surrounding the administration of the vaccines rather than on what I believe is the decisive question: whether an informed intermediary could reasonably be expected to have made an individualized assessment of the risks and potential side effects of the vaccine which the patient could then rely upon. It follows then that once a pharmaceutical manufacturer knows or has reason to know that the ethical drug will be administered without any meaningful assessment by a physician, it may not avail itself of the informed intermediary doctrine to extinguish its duty to warn the ultimate consumer of the risks attendant to its product. The program or surroundings should not be dispositive, but should be considered as a factor in reaching this determination.
In Stephens v Searle & Co. (602 F Supp 379 [ED Mich 1985]), the court declined to apply the informed intermediary doctrine although the oral contraceptive was prescribed by the plaintiff’s physician. Rather, the court analyzed the facts of the case, and assessed the patient’s reliance on the doctor’s *184 advice. Since, in that case, the contraceptive was not prescribed for a therapeutic, diagnostic or curative purpose (where a physician may be assumed to have played an active role), but only for contraceptive purposes (where often the decision is made to utilize the drug without a doctor’s assessment of the benefits and risks), the manufacturer was held to have a duty to warn the ultimate consumer. (See also, MacDonald v Ortho Pharm. Corp., 394 Mass 131, 475 NE2d 65 [1985].)
I believe that the resolution of the issue here must turn on the patient’s opportunity to make an informed decision whether or not to receive a vaccine, or alternatively, to rely on an informed intermediary to make that decision for him, analyzing his needs and the possible risks and side effects of the vaccine.
Where vaccines are administered prophylactically by a physician in connection with overseas travel, an in-depth analysis of the benefits and risks to the individual of the vaccine’s administration appears to be unlikely. When the forum for the vaccination becomes a company clinic, as here, it is even more improbable that such an analysis will be undertaken. Under these circumstances, the pharmaceutical manufacturer should know or have reason to know that the vaccines are customarily administered without any meaningful appraisal by an "informed intermediary”. (See, Stephens v Searle & Co., supra.) Accordingly, based on my analysis of the law and the evidence presented at trial, I believe that my instruction to the jury that the drug manufacturers owed a duty to warn Mr. Samuels, the recipient of the vaccine, of the risks attendant to its administration, was proper.
V. ADMISSION OF PHYSICIAN’S TESTIMONY AT TRIAL
The plaintiffs contend that the court erroneously admitted the testimony elicited from Dr. Stanton in cross-examination to the effect that at the present time he does not apprise vaccination recipients of the warnings contained in the vaccine package inserts at issue. The plaintiffs insist that admitting this testimony and allowing it to be read after the jury had retired "resurrected the 'learned intermediary rule’ which the Court had rejected.” They contend that the admission of this testimony had the effect of contradicting and undercutting the court’s instruction that the defendants had a duty to warn the plaintiff directly.
*185 The plaintiffs’ contention is without merit.
First, evidence relating to Texaco’s current practices was relevant to the issues raised in the pleadings and to the third-party action against Texaco by defendants Lederle and Sclavo. It was therefore properly admitted into evidence.
Second, contrary to plaintiffs’ contentions, the charge stated in numerous places that the duty to warn was owed directly to the plaintiff. There is no basis for plaintiffs’ assertion that the jury’s finding of no proximate cause was erroneously based on evidence relating to Texaco’s practices. Accordingly, even assuming that the evidence of Texaco’s current practices was erroneously admitted, any error was harmless and does not warrant a new trial.
VI. THE COURT’S CHARGES ON CAUSATION
Plaintiffs’ second basis for an order vacating the jury’s verdict and granting a new trial is that the charge confused the jury on the issue of causation.
At trial, the plaintiffs requested a unified charge on proximate cause based on PJI 2.70,[8] arguing that splitting causation into two issues would be unwarranted and confusing.
They argued that the issue of causation is "not generally broken down into sub-issues of cause-in-fact and proximate cause” and by doing so, the court "plainly affected the jury’s understanding of proximate cause”. I find no merit to this argument.
Where a plaintiff attempts to hold the manufacturer of a product strictly liable for injuries suffered based on the manufacturer’s failure to provide adequate warnings, thereby rendering the product "defective”, the plaintiff has the burden of establishing by a preponderance of the evidence that (1) the product in fact caused the plaintiff’s injuries, (2) the manufacturer breached its duty to provide reasonable and adequate warning, and (3) the absence of such warnings was the proximate cause of the plaintiff’s injuries.[9] The same burden applies where the product is a pharmaceutical product, such as a *186 vaccine. (See, e.g., Lindsay v Ortho Pharm. Corp., 637 F2d 87 [2d Cir 1980], supra.) As the court stated in Lindsay: "A plaintiff who seeks recovery for an injurious side effect from a properly manufactured prescription drug must prove that the drug caused her injury and that the manufacturer breached a duty to warn of the possibility that the injurious reaction might occur.” (Supra, at pp 90-91 [applying New York law].)
It is essential that a plaintiff must establish that the injury sued upon resulted from the use of defendant’s product. While that threshold element of causation-in-fact is rarely at issue in the conventional products liability action, where, as here, there is a dispute with respect to whether the product involved in the action actually caused the claimed injuries, the plaintiff bears the burden of proof on that issue. Thus, in Ferebee v Chevron Chem. Co. (736 F2d 1529 [DC Cir 1984]), an agricultural worker who claimed that he contracted pulmonary fibrosis from exposure to paraquat was required to prove both that the paraquat was the cause of his illness and that an inadequate warning was the proximate cause of it. And, in In re "Agent Orange” Prod. Liability Litigation (603 F Supp 239 [EDNY 1985]), claims against the Government by wives and children of United States servicemen exposed to the defoliant "Agent Orange” were dismissed for lack of proof that Agent Orange was the cause of the plaintiffs’ injuries.
Therefore, my instruction that the plaintiffs had the burden of establishing that it was more likely than not that Mr. Samuels’ paralysis was caused by the defendants’ vaccines was not, as plaintiffs argue, a misstatement of the law.
The plaintiffs contend, however, that the threshold issue of cause-in-fact is subsumed in the standard New York Pattern Jury Instruction on proximate cause. They argue that the phrase "substantial factor” as used in the standard charge encompasses the notion of cause-in-fact, and that a separate instruction on cause-in-fact was therefore unwarranted and improper.
I disagree. In a case such as this, where cause-in-fact is a critical issue, separate charges are necessary. Otherwise, the jury might be distracted from considering the threshold issue of causation by instead focusing upon the quality of the warnings provided by the defendants.
Monahan v Weichert (82 AD2d 102 [4th Dept 1981]) involved a medical malpractice action which the trial court dismissed on the defendant’s motion for a directed verdict. The Appel *187 late Division reversed on the ground that the issue of proximate cause presented a proper jury question. The court distinguished between cause-in-fact and proximate cause, stating as follows: "Causation incorporates at least two separate but related concepts: cause-in-fact and proximate cause. Cause-in-fact refers to those antecedent events, acts or omissions which have 'so far contributed to the result that without them it would not have occurred’ * * * Proximate cause serves to limit, for legal or policy reasons, the responsibility of an actor for the consequences of his conduct”. (Supra, at p 106 [citations omitted].)
Monahan reaffirmed the settled rule that before a party may be held liable for negligence, the alleged negligence must not only be the cause-in-fact of the plaintiff’s injuries, but it must also be the proximate cause of those injuries. The decision further acknowledged that the requirement of cause-in-fact may be satisfied when the allegedly negligent act is a substantial factor in producing the resultant injury. The decision, however, does not provide any support for plaintiffs’ proposition that it is erroneous for this court to separate the causation instruction into its two essential components— cause-in-fact and proximate cause. (See also, Flores v Flushing Hosp. & Med. Center, 109 AD2d 198 [1st Dept 1985].)
I believe that the jury charge was carefully structured with respect to each element of the cause of action. In this way, the jury was able to understand the fundamental issues of law involved. Further, separate charges were calculated to avoid the confusion which would, I believe, have resulted from a "unified” charge as urged by the plaintiff. (See, Bolm v Triumph Corp., 58 AD2d 1014 [4th Dept 1977].) There is no indication that the jury was confused regarding the issue of causation.
VII. JUROR MISCONDUCT
Finally, the plaintiffs contend that the verdict should be set aside because one of the jurors allegedly failed to disclose during voir dire examination that she had a close friend who was an attorney.
It is well settled in New York that jury deliberations are sacrosanct and a verdict rendered in open court should not be disturbed except in very limited circumstances. Thus, the general rule in New York is that a verdict may not be impeached by the testimony or affidavits of jurors concerning *188 the deliberative process. (See, e.g., People v Sprague, 217 NY 373 [1916]; Payne v Burke, 236 App Div 527 [4th Dept 1932].)
Here, the plaintiffs assert that one of the jurors — the forewoman, Ms. Ritchey F. Goodwin, deliberately failed to disclose during voir dire examination that she had an attorney as a close friend. The plaintiffs contend that they were prejudiced because if this had been revealed they would have exercised their right to a peremptory challenge to excuse her.
There is a disagreement among the attorneys as to their recollection of what was asked during voir dire. No transcript was taken of the voir dire examination and the plaintiffs have offered no independent evidence to corroborate their recollection. Accordingly, since the plaintiffs have not met their burden of establishing the existence of misconduct, that branch of the application fails.
But, even assuming, arguendo, that Ms. Goodwin was asked whether she had any close friends who were attorneys and failed to disclose that she did, such conduct, as a matter of law, is not the type of "juror misconduct” that has been held to warrant a new trial. While the introduction of extraneous evidence into the jury deliberations, such as a dictionary definition of a relevant term (Holland v Levine, 39 Misc 2d 103 [Sup Ct, Nassau County 1963]), or the unauthorized visitation of the scene of a crime or accident (People v De Lucia, 20 NY2d 275 [1967]), has been held to constitute such misconduct, the failure to answer a question correctly during voir dire warrants a new trial only where it is demonstrated that the juror intentionally concealed facts, bias or prejudice that would render the prospective juror disqualified ab initio from service. (See, e.g., People v Leonti, 262 NY 256 [1933]; Holland v Blake, 38 AD2d 344 [3d Dept], affd 31 NY2d 734 [1972].) The plaintiffs’ allegations do not meet this strict standard.
The plaintiffs have not cited any case in which the failure of a prospective juror to disclose a relationship with an attorney was found to constitute misconduct warranting a new trial. In each case relied upon by the plaintiffs, the specific fact concealed was inherently prejudicial, and the act of concealment and the surrounding circumstances implied that the losing party did not receive a fair and impartial trial. For example, in McHugh v Jones (258 App Div 111 [2d Dept 1939], affd 283 NY 534 [1940]), two of the jurors deliberately concealed on voir dire that they knew and liked the defendant, and would be unable to fairly interpret the evidence.
*189 Additionally, nondisclosure of a disqualifying fact during voir dire is not a ground for a new trial unless the nondisclosure is deliberate and willful. (See, e.g., Holland v Blake, supra; Murphy v 16 Abingdon Sq. Realty Corp., 243 App Div 815 [2d Dept 1935]; McHugh v Jones, supra, at p 112.) Here, the plaintiffs have offered no evidence to the effect that Ms. Goodwin knew that her friendship with an attorney would result in her being stricken from the jury by the plaintiffs’ attorneys. It is not claimed that plaintiffs’ counsel informed prospective jurors that an affiliation with an attorney would lead to their being excused, nor was any juror challenged or excused on the basis of such an affiliation. In fact, the plaintiffs did not exercise any peremptory challenges at all. Accordingly, there is no basis to conclude that Ms. Goodwin deliberately answered questions inaccurately or evasively in order to remain on the jury, and so, there are no grounds for finding any improper conduct.
It is equally settled that a verdict will not be set aside for juror misconduct absent proof of substantial prejudice. (See, e.g., Snediker v County of Orange, 58 NY2d 647 [1982]; People v Rhodes, 92 AD2d 744 [4th Dept 1983]; Tanner v Stim, 66 Misc 2d 1030 [Sup Ct, Bronx County 1971].)
In this regard, the plaintiffs have alleged that Ms. Goodwin might have discussed the case with her attorney friend and that some members of the jury may have been influenced by knowing that she had an attorney as a friend. It is suggested that her friend became, in essence, a "seventh juror”.
Additionally, the plaintiffs cite certain statements made by juror number 4, Jay Rosenfeld, in a postverdict interview, to the effect that Ms. Goodwin had strong feelings about the case by the middle of the trial and "identified with the lawyers”.
First, such statements run afoul of the established rule that affidavits and postverdict statements of jurors are not admissible to impeach a verdict except to show that extrinsic influence has been exerted on the jury. (See, People v Sprague, supra; Payne v Burke, supra; People v DeLucia, supra.) Mr. Rosenfeld’s statements do not show the existence or effect of any extrinsic influence and are therefore inadmissible to discredit the verdict.
Even assuming that the statements attributed to Mr. Rosenfeld are admissible for some limited purpose, I hold that they do not lend any support to plaintiffs’ claims of prejudice. There is nothing improper about a juror forming opinions *190 about the issues being tried. Indeed, the jury system is intended and designed to achieve just that. Further, Mr. Rosenfeld’s statement that Ms. Goodwin "identified with the lawyers” cannot reasonably be read to imply that she was biased in any way for or against any of the parties in the trial who were all represented by lawyers.
Plaintiffs maintain that, at the very least, they are entitled to a hearing on this issue of juror misconduct. I disagree. Due to the lack of any evidentiary basis for their allegations of prejudicial misconduct, I hold that a hearing is not warranted. (See, Snediker v County of Orange, supra.)
While the standards governing when a hearing to explore charges of juror misconduct is warranted in civil actions have not been extensively articulated, in criminal proceedings, it has been held that before a hearing will be directed "[t]he charges must not be speculative and absurd, but there must be some substantial factual basis to justify an examination of the jury that rendered the verdict which is sought to be set aside.” (People v Whitmore, 45 Misc 2d 506, 510 [Sup Ct, Kings County 1965], revd on other grounds 27 AD2d 939 [2d Dept 1967].) The Supreme Court of the United States has also recognized a minimal standard in criminal cases, stating that there must be a prima facie showing of wrongdoing — a mere charge of wrongdoing without more will not suffice. (Clark v United States, 289 US 1,14 [1933].)
The plaintiffs’ proof has fallen far below even the criminal standard, which presumably requires a lesser showing of a factual basis than that which is required in civil actions.
I therefore hold that the plaintiffs are not entitled to a new trial or a hearing on their claim of juror misconduct.
vm. CONCLUSION
Settle an order in conformity with the above pertaining to matters raised in the posttrial motion only.

. A different nurse administered the vaccine(s) on each occasion.

. In performing this function, the nurses refer to Dr. Stanton’s recommendation that employees traveling overseas should receive typhoid and tetanus vaccinations if their previous vaccines are not current. Additionally, the nurses review the CDC manual, Health Information for International Travel and the Weekly Update to determine vaccines required by foreign governments and what diseases, if any, are reported in various countries.

. Mrs. Samuels’ claim was grounded in loss of consortium.

. In a separate question, the jury also found that Lederle had failed to reasonably and adequately warn Texaco of the risk of GBS.

. Other justifications include the difficulty of warning each ultimate user of the drug (see, e.g., Terhune v Robins Co., 90 Wn 2d 9, 14, 577 P2d 975[1978]), and the potential interference within the doctor/patient relationship (see, Dunkin v Syntex Labs., 443 F Supp 121, 123 [WD Tenn 1977]), as well as the fear that detailed warnings to patients could mislead them. (Supra.)

. The plaintiff contracted polio from her daughter after her daughter had received a live polio vaccine.

. In Givens v Lederle (556 F2d 1341, 1345 [1977]) the court observed "[f]or example, Dr. LaRue, the private pediatrician, testified that the administration in his office 'really doesn’t differ’ from that of the Public Health Center; 'not in the administration at all.’ * * * If so, then Lederle [the defendant] is responsible for taking definite steps to get the warning directly to the consumer.”

. "PJI 2:70. Proximate Cause — In General. An act or omission is a proximate cause of an injury if it was a substantial factor in bringing about the injury, that is, if it had such an effect in producing the injury that reasonable men would regard it as a cause of the injury.”

. Compare the similar burden imposed on plaintiff’s alleging lack of informed consent. (Flores v Flushing Hosp. & Med. Center, 109 AD2d 198 [1st Dept 1985]; Monahan v Weichert, 82 AD2d 102 [1981].)