*368 OPINION OF THE COURT
William F. Mastro, J.
Motion (No. 847) of defendant Lederle Laboratories, Division of American Cyanamid Company (Lederle) and the cross motion (No. 2631) of the plaintiff for summary judgment are both denied.
Plaintiffs complaint[1] alleges that he “contracted paralytic poliomyelitis as a result of having contact with live polio virus which had been excreted by his infant daughter Diana as a result of having taken * * * Orimune” (fl 6). Orimune is described in the complaint as “a live oral trivalent (polio virus vaccine) * * * which contains Savin [should read Sabin] Strains types 1, 2 and 3” (fl 3). The Sabin oral vaccine, developed by Dr. Albert Sabin in the middle and later 1950’s, replaced the injectable Salk vaccine, developed by Dr. Jonas Salk, as the primary weapon against polio (see, Reyes v Wyeth Labs., 498 F2d 1264, 1295-1298, appendix B [5th Cir 1974], cert denied 419 US 1096). The Sabin oral vaccine introduces living but attenuated polio virus into the recipient’s system.[2] It was stated in Loge v United States (662 F2d 1268, 1270 [8th Cir 1981]) that:
“A characteristic of live Sabin polio vaccines such as Orimune is that not only is the vaccine’s recipient immunized from polio, but unimmunized persons who come into close contact with the recipient also are immunized through a shed virus which spreads from the recipient to the ‘contact.’
“A risk-free alternative to inoculation with the live Sabin vaccine is the Salk vaccine in which the virus is killed so that the recipient cannot contract polio nor can the recipient shed a live virus to unimmunized contacts.”
Plaintiff is the father of Diana, born on December 16, 1978. Diana’s pediatrician was the codefendant doctor, Leroy L. Schwartz (now deceased). Dr. Schwartz administered three doses of Orimune to Diana: one in March 1979, a second in May 1979, and the third in July 1979. Plaintiff was diagnosed *369 with paralytic poliomyelitis in June 1979. At the time, defendant Lederle was apparently the only manufacturer and distributor of oral polio vaccine in the United States.
Defendant Lederle has moved for summary judgment claiming it is not liable for plaintiffs condition because Lederle provided adequate warnings on its package insert at the time in question (Martin v Hacker, 83 NY2d 1 [1993]). Plaintiff cross-moves for summary judgment, seeking a court determination that the insert provided by Lederle was inadequate.
The 1975 package insert for Orimune, under the heading “Adverse Reactions”, reads:
“Expert opinion is in agreement that the administration of live oral polio virus vaccines is generally an effective and safe method of protecting populations against the natural disease. Paralytic disease following the ingestion of live polio virus vaccines has been reported in individuals receiving the vaccine, and in some instances, in persons who were in close contact with subjects who had been given live oral polio virus vaccine.
“The rare occurrence of ‘vaccine related cases’ were considered ‘compatible’ with vaccine induced disease where certain epidemiological criteria including certain incubation, clinical and laboratory values, could be judged compatible with vaccine as a cause. It has been estimated that the risk of vaccine induced paralytic poliomyelitis is about one chance per million doses.
“The estimated risk of vaccine-induced paralytic disease occurring in vaccines or those in close contact with vaccines is extremely low. However, the ‘risk’ should be considered by the physician and such information should be conveyed to the parent(s) at the time of vaccination. Those parents of a vaccíneo who have not had previous polio vaccination should probably be considered among those adults as subject to increased risk of exposure and in this special situation, in the judgment of the physician responsible, protection may be needed for these intimate contacts.”
This case has a lengthy history in the courts. In 1992, codefendant Schwartz was granted summary judgment dismissing plaintiffs’ complaint as against him. This decision was affirmed by the Appellate Division (Tenuto v Lederle Labs., 207 AD2d 541) and thereafter reversed by the Court of Appeals (90 NY2d 606, 614) which found that the “[p]laintiffs f[e] 11 within a determinate and identified class — immediate family members— whose relationships to the person acted upon [plaintiffs’ infant *370 daughter who received the oral polio vaccine] have traditionally been recognized as a means of extending and yet limiting the scope of liability for injuries caused by a party’s negligent acts or omissions” (citations omitted). The Court, of Appeals noted that “if Dr. Schwartz had no responsibility to pass on warnings regarding the dangers associated with the administration of this vaccine, then the duty of the manufacturer to inform doctors of such risks would be meaningless.” (Supra.)
Schwartz also sought summary judgment against Lederle on its cross claim against him for indemnity and contribution. This motion was denied by the Supreme Court but reversed by the Appellate Division (Tenuto v Lederle Labs., 234 AD2d 284, 285-286) which dismissed Lederle’s cross claims, holding: “The learned intermediar/ doctrine provides that a manufacturer’s duty is to warn the physician of risks posed by its products. The physician, in turn, has a duty ‘to balance the risks against the benefits of various drugs and treatments and to prescribe them and supervise their effects’ (Martin v Hacker, 83 NY2d 1, 9). Contrary to the defendant Lederle’s contention, the ‘learned intermediary’ doctrine did not impose a duty on the physician to inform these plaintiffs, who were not his patients, of the warnings contained in the package insert provided by Lederle (see, Wolfgruber v Upjohn, 72 AD2d 59, affd 52 NY2d 768; Eiser v Feldman, 123 AD2d 583). Accordingly, Lederle’s cross claim against the defendant Schwartz is without merit as a matter of law.”
As noted above, plaintiff’s claim against Schwartz was reinstated by the Court of Appeals; however, Lederle never appealed the dismissal of its cross claim against Schwartz (Tenuto v Lederle Labs., 90 NY2d 606, 609, supra).
New York generally follows the guidelines set forth in the Restatement with respect to products liability (see, e.g., Eiser v Feldman, supra; McFadden v Haritatos, 86 AD2d 761; Farina v Niagara Mohawk Power Corp., 81 AD2d 700; Wolfgruber v Upjohn Co., supra; Baker v St. Agnes Hosp., 70 AD2d 400). The new Restatement (Third) of Torts — Products Liability sets forth a separate section specifying the standard of liability for prescription drugs such as the one at issue here. Section 6 provides that
“[flor purposes of liability * * * a prescription drug * * * is defective if at the time of sale or other distribution the drug * * *
“is not reasonably safe due to inadequate instructions or warnings”. (Restatement [Third] of Torts — Products Liability §6 [b] [3].)
*371 Section 6 further provides that “[a] prescription drug * * * is not reasonably safe due to inadequate instructions or warnings if reasonable instructions or warnings regarding foreseeable risks of harm are not provided to: (1) prescribing and other health-care providers who are in a position to reduce the risks of harm in accordance with the instructions or warnings” (Restatement [Third] of Torts — Products Liability § 6 [d]).
Regarding this new section 6, an article by the Food and Drug Institute provides: “As a practical matter under this standard, manufacturers should be able to present all the facts and circumstances surrounding the selection or omission of each particular warning. The test turns on whether the defendant acted as a reasonably prudent manufacturer would have acted in similar circumstances. Moreover, the new test plainly provides that no liability results for unknown and unknowable risks — the standard already followed by many jurisdictions.” (Wagner and Peterson, The New Restatement [Third] of Torts— Shelter From the Product Liability Storm for Pharmaceutical Companies and Device Manufacturers?, 53 Food & Drug LJ 225, 234-235.) The Food and Drug Institute’s article cites to case law of various jurisdictions, including New York’s Martin v Hacker (83 NY2d 1, supra), which clarified New York law with respect to warnings for prescription drugs. Martin v Hacker (supra, at 8, 10) states that “[t]he manufacturer’s duty is to warn of all potential dangers in its prescription drugs that it knew, or, in the exercise of reasonable care, should have known to exist”, and that such warnings “may be held adequate as a matter of law.” However, except in cases where the most unusual circumstances exist, the adequacy of drug warnings is a question of fact (see, Ramirez v Wyeth Labs., 179 Misc 2d 764 [Sup Ct, NY County, Sklar, J.], citing Morrow v Mackler Prods., 240 AD2d 175, 176).
In Martin v Hacker (supra, at 10) the Court of Appeals set forth the factors to be used in analyzing the adequacy of drug warnings. The Court said: ‘Whether a given warning is legally adequate or presents a factual question for resolution by a jury requires a careful analysis of the warning’s language. The court must examine not only the meaning and informational content of the language but also its form and manner of expression. Always bearing in mind that the warning is to be read and understood by physicians, not laypersons”.
According to the Court of Appeals this analysis should start with ascertaining the seriousness of the involved risk, which depends on the consequences of the side effects. After establish *372 ing the general level of risk, a court should examine the language of the drug insert for its “accuracy, clarity and relative consistency” (Martin v Hacker, supra, at 11). The Court of Appeals noted that “[f]or a warning to be accurate it must be correct, fully descriptive and complete * * * and it must convey updated information as to all of the drug’s known side effects” (supra).
As a general rule, courts agree that the duty of a drug producer or drug seller to warn of a particular risk only attaches at the time that such party knew, or should have known, of the risk in question (see, Prosser and Keeton, Torts § 96, at 688 [5th ed], citing, inter alia, Reyes v Wyeth Labs., 498 F2d 1264, supra). In any given case, whether the drug producer or drug seller provides “updated information as to all of the drug’s known side effects” (Martin v Hacker, supra, at 11) within an acceptable time frame is an issue that must be determined. In Baker v St. Agnes Hosp. (70 AD2d 400, 402, supra) the Court spoke of the availability of such information “at the time the instant cause of action arose.” Other cases also speak of the information available at the time that the drug was used (see, e.g., Donigi v American Cyanamid Co., 57 AD2d 760 [“whether in 1958 (the time of use) the defendant knew or should have known that its product caused permanent teeth staining in children”]; Ezagui v Dow Chem. Corp., 598 F2d 727, 733 [2d Cir 1979] [“(t)he knowledge of risk available to (the defendant) in 1960 (the time of use)”]). One commentator noted: “A time continuum is emphasized in duty to warn cases. Courts attempt to determine at what point sufficient knowledge was present, thereby creating the duty.” (Note, The Liability of Pharmaceutical Manufacturers for Unforeseen Adverse Drug Reactions, 48 Fordham L Rev 735, 749, n 101 [1980], citing, inter alia, Basko v Sterling Drug, 416 F2d 417 [2d Cir 1969].) The Basko court (supra, at 426) stated: “Dates are thus vitally important, since the duty to warn depends on when the risk became apparent.” Thus, two dates are critical here — the date the vaccine was administered, and the date that certain risks associated with the vaccine became apparent. Here, the date the vaccine was administered, March, May and July of 1979, is not at issue. What is at issue is the date or time period that the risks associated with the vaccine became apparent and whether the information provided with the vaccine plaintiffs daughter received adequately warned of those known risks.
In determining that date or time period, a brief review of some past polio cases is in order. In 1972 a Florida mother *373 developed polio after her infant daughter was administered the Sabin oral polio vaccine from her pediatrician (Givens v Lederle, 556 F2d 1341 [5th Cir 1977]). The vaccine had been manufactured by Lederle and the mother had never received a polio vaccination of either kind (Salk injection or Sabin oral). On June 18, 1974 a jury returned a verdict for Lederle after deciding that the plaintiffs had not proved that the oral polio vaccine was the proximate cause of her polio. A subsequent June 5, 1975 jury, however, returned a verdict in plaintiffs’ favor. In affirming the latter verdict, the Fifth Circuit, United States Court of Appeals (Givens v Lederle, supra, at 1344), noted: “Lederle had taken the unwavering position at trial, in contrast to its own warning, that no one prior to Mrs. Givens had ever contracted an active case of poliomyelitis from the vaccine. Dr. Albert Sabin himself, the creator of the oral vaccine, testified for Lederle that his vaccine could not cause polio”, and the Fifth Circuit found (at 1345-1346) that: “the jury could have decided that had plaintiff known of the risk involved, she would not have allowed Dr. LaRue to immunize her infant daughter with the live polio virus vaccine at that time. Instead, she might have waited until she (Mrs. Givens) had been vaccinated; or until Wendy was older; or until the Salk vaccine (which does not use live polio virus) was available. Indeed, it is conceivable that Mrs. Givens would have decided, albeit perhaps unwisely, to refuse vaccination of any family member.” In 1978 an Ohio mother similarly contracted polio after her infant daughter was administered Orimune (Williams v Lederle Labs., 591 F Supp 381).
In 1975 a Kansas father contracted polio after his infant daughter had been administered Orimune (Johnson v American Cyanamid Co., 239 Kan 279, 718 P2d 1318). Johnson’s deposition testimony indicated that he had assisted in the administration of the oral polio vaccine. Johnson steadied the infant by placing his hand under her jaw. Some of the vaccine ran out of the infant’s mouth onto an open cut on Johnson’s hand which, he believed, occurred earlier in the morning while he was fixing a barbed wire fence on his farm.
The Supreme Court of Kansas concluded that the trial court had erred in denying the defendant’s motion for a directed verdict. The dissenting Judge, however, emphasized “that the warning [the same 1975 insert warning at issue here] * * * did not in any way convey to [the doctor] the fact that there was a reasonably available alternative product and the reasonable risks posed by such alternative product.” (Johnson v Amer *374 ican Cyanamid Co., supra, 239 Kan, at 295, 718 P2d, at 1329-1330 [dissenting opn].) The dissent also noted that certain “testimony could lead a reasonable person to the conclusion that the warning contained in the 1975 insert was not sufficient to advise a pediatrician of the danger involved in using live polio vaccine or of the other less dangerous alternative vaccine available.” (Johnson v American Cyanamid Co., supra, 239 Kan, at 297, 718 P2d, at 1331 [dissenting opn].)
In 1974 a Michigan mother developed polio after her infant daughter was administered the Sabin oral polio vaccine manufactured by Lederle (Dunn v Lederle Labs., 121 Mich App 73, 328 NW2d 576, 578). “Lederle admitted at trial that it knew of contact polio as early as 1966” but the Michigan Court of Appeals found that Lederle had no duty to warn how to avoid the dangers of contact polio. (Supra, 121 Mich App, at 76, 328 NW2d, at 578.) The Dunn court stated (supra, 121 Mich App, at 81, 328 NW2d, at 580) that “[a] danger is often avoided simply by refusing to use the dangerous product” but that “this option was not available to the plaintiff, her daughter, or her doctor” (apparently Michigan law mandated vaccination with the Sabin oral vaccine). The Dunn court held: “Considering the slight risk of contact polio[3] the variability of risks of harm (depending on many personal factors, including cleanliness and frequency and type of contact with a recently-vaccinated child), the introduction of individualized medical judgment, and the other policy reasons outlined, we do not accept plaintiffs’ invitation to add new requirements to a manufacturer’s duty to warn.” (Dunn v Lederle Labs., supra, 121 Mich App, at 83, 328 NW2d, at 581.) The Federal Government, however, appears to have thought otherwise.
The October 7, 1977 Centers for Disease Control’s Morbidity and Mortality Weekly Report noted: “Although the risk of vaccine-associated paralysis is extremely small for vaccines and their susceptible family and other close personal contacts, they should be informed of this risk. When the attenuated vaccine strains are to be introduced into a household with adults who have never been vaccinated, some physicians may choose to give these adults at least 2 doses of IPV a month apart, if not the full primary series, before the children receive TOPV (Trivalent Oral Polio Vaccine).”
*375 By the time this issue was considered again in 1987 (Plummer v Lederle Labs., 819 F2d 349), an updated 1979 package insert for Orimune was at issue. The Second Circuit, applying California law, found the Orimune insert adequate as a matter of law: “[e]ven assuming * * * [as the plaintiff argues here] that the warnings did minimize the risk of contracting contact polio, the fact remains that the probability of contracting either contact polio or wild polio is extremely remote.” {Supra, at 357.) Although the Plummer court refused to extend the duty to warn to include the duty to specify precautions for avoiding contact polio,[4] it did note that the newer insert included such language. “ ‘The risk of vaccine-associated paralysis is extremely small for vaccines, susceptible family members and other close personal contacts. However, the responsible physician should convey or specifically direct personnel acting under his authority to convey the warnings to the vaccinee [or] parent * * * of the possibility of vaccine-associated paralysis prior to administration of the vaccine. When the attenuated vaccine strains are to be introduced into a household with adults who have never been vaccinated, some physicians may choose to give these adults at least two doses of IPV a month apart .* * * before the children receive ORIMUNE.’” {Supra, at 352-353 [emphasis added].) Interestingly, that part of the language of the 1979 Orimune package insert emphasized above is the exact language used in the October 7, 1977 Morbidity and Mortality Weekly Report. Thus, unlike the 1975 insert at issue in the case at bar, in Plummer the court noted that “the 1979 package insert advises that unvaccinated individuals may avoid the risk of contracting contact polio from Orimune vaccines by receiving an IPV [inactivated polio virus] vaccination prior to contact.” {Supra, at 353, citing, inter alia, Basko v Sterling Drug, 416 F2d 417 [2d Cir 1969], supra.)
In 1993, the New York Court of Appeals in Martin v Hacker (83 NY2d, supra, at 11) reinforced prior holdings that a drug warning “must convey updated information” and cited, with approval, Baker v St. Agnes Hosp. (70 AD2d, supra, at 406) *376 which had earlier held that this “continuing obligation” of a drug manufacturer was twofold. The Baker Court said: “First, it must keep abreast of knowledge of its products as gained through research, adverse reaction reports, scientific literature and other available methods * * * [s]econd, and equally important, it must take such steps as are reasonably necessary to bring that knowledge to the attention of the medical profession.” (Supra.) Baker (70 AD2d, at 407) then went on to describe the “well-known methods by which pharmaceutical manufacturers apprise the medical profession of the dangers of a drug”: (1) “the Physician’s Desk Reference (PDR), the compendium often relied upon by physicians to obtain knowledge of the proper uses and hazards of drugs” (supra, at 402); (2) “so-called ‘Dear Doctor’ letters addressed to physicians” (supra, at 407); and (3) “the use of ‘detail men’ who call upon physicians personally to present them with information concerning pharmaceuticals.” (Supra.)
From October of 1977, when Lederle knew of the Federal Government’s recommendations regarding vaccination of adults who may be in close contact of children receiving Orimune, until the 1979 Orimune package insert, there is no indication that Lederle took any steps “to bring that knowledge to the attention of the medical profession.” (Baker v St. Agnes Hosp., supra, at 406.) Plaintiff also points to other documentary evidence (see, e.g., Nightingale, Recommendations for a National Policy on Poliomyelitis Vaccination, 297 [No. 5] New Eng J Med 249 [Aug. 4, 1977]) which highlights the risk of close contacts contracting paralytic polio; yet defendant did not promptly revise its package insert or take other steps to indicate that IPV should be offered to close contacts to reduce the risk of contracting contact polio. Clearly this information was available at the time plaintiffs daughter was vaccinated.
According to Martin v Hacker (supra, at 9), prescription drug warnings are intended for the physician having “the least knowledge and experience with the drug” who is going to use these warnings to “balance the risks against the benefits of various drugs and treatments and to prescribe them and supervise their effects.” Under the circumstances of this case, this court finds that Lederle’s failure to include the available information about IPV precautions with respect to the steps a physician could take to avoid the risk of contact polio raises issue of fact as to whether Lederle provided reasonable
“instructions or warnings * * * to * * *
*377 “prescribing and other health-care providers who are in a position to reduce the risks of harm in accordance with the instructions or warnings” (Restatement [Third] of Torts— Products Liability § 6 [d] [1]).
Moreover, plaintiff raises an issue of fact as to whether the warning Lederle did provide in the 1975 package insert met the standard of “accuracy, clarity and relative consistency” set out in Martin v Hacker (supra, at 11). Plaintiff notes, for example, Lederle’s use of quotation marks around the word “risk” in the package insert at issue, which arguably “dilutes the intensity of [the] caveat” (Martin v Hacker, supra, at 11).
In order to obtain summary judgment, a movant must establish its defense or cause of action sufficiently to warrant a court’s directing judgment in its favor as a matter of law (see, e.g., Zuckerman v City of New York, 49 NY2d 557, 562; Friends of Animals v Associated Fur Mfrs., 46 NY2d 1065, 1067-1068). There are issues of fact as to the adequacy of the 1975 package insert for Orimune which cannot be resolved upon the papers now before the court. The existence of such factual issues precludes summary judgment (see, e.g., Vigio v New York Hosp., 228 AD2d 278; Mendolia v Saad, 201 AD2d 710). The focus of the court on a summary judgment motion is issue finding, not issue determination (see, e.g., Amatulli v Dehli Constr. Corp., 77 NY2d 525, 532).
Accordingly, it is ordered that the defendant’s motion (No. 847) and the plaintiffs cross motion (No. 2631) for summary judgment are both denied.

. The complaint originally contained a loss of consortium claim on behalf of plaintiffs then wife which was discontinued pursuant to a January 7, 1998 stipulation which was “So Ordered” by this court.

. An attenuated polio virus is one which laboratory processes have rendered incapable of producing disease (to the extent of attenuation), but which retains sufficient strength to cause the production of antibodies to resist and destroy an attacking wild or virulent polio virus in the vaccinee’s alimentary tract. (See, Reyes v Wyeth Labs., supra, at 1296, appendix B.)

. Testimony at trial indicated that the incidence of contact polio was between one in five million (the rate for all vaccine-related polio cases) and one in 10 million.

. Looking to California law, the Second Circuit determined that in the absence of any applicable California precedent on the issue, “the California Supreme Court would not expand a manufacturer’s duty and require that specified precautions be stated, especially where the warnings are being directed to a ‘learned intermediary’ such as a doctor. In short, judgment notwithstanding the verdict should have been directed since there is no duty under California law to specify precautions in the prescription drug context.” (Plummer v Lederle Labs., supra, at 358.)