**Roger ERONY and Noreen Dellacorte as Administrators of the Estate of Alexander Erony, and Roger Erony, individually, Plaintiffs,**

v.

**ALZA CORPORATION and Janssen Pharmaceutica, Inc., Defendants.**

No. 94 Civ. 5413 (DC).

United States District Court, S.D. New York.

Dec. 21, 1995.

Steven B. Kaufman, New York City, for Plaintiffs.

Arter & Hadden by George Gore, Cleveland, Ohio and Patterson, Belknap, Webb & Tyler LLP by Gordon L. DeMario, New York City, for Defendants.

## OPINION

CHIN, District Judge.

This products liability action arises from the tragic accidental death of a fourteen year-old boy, Alexander Erony ("Alex"). Alex died from sucking on used patches of Duragesic, a transdermal delivery system that contains a potent narcotic analgesic, fentanyl. His parents Roger Erony ("Mr. Erony") and Noreen Dellacorte ("Ms. Dellacorte") bring this action against the manufacturer and distributor of Duragesic, Alza Corporation ("Alza") and Janseen Pharmaceutica, Inc. ("Janseen"), respectively, seeking damages on two theories: (1) failure to warn and (2) negligent infliction of emotional distress.

Defendants now move for summary judgment, arguing that the warnings were adequate as a matter of law. Defendants also argue that any inadequacy in their warnings was not the proximate cause of Alex's death. Finally, defendants move for summary judgment on plaintiffs' negligent infliction of emotion distress claim.

Because I find that material issues of fact remain as to both the adequacy of the warnings and the proximate cause of Alex's death, defendants' motion for summary judgment is denied as to the failure to warn claim. The motion is granted, however, as to the negligent infliction of emotional distress claim.

## BACKGROUND

### A. Duragesic

Defendants' product, Duragesic, is a patch containing fentanyl, a potent narcotic analgesic. Duragesic is a transdermal system—the medicine is absorbed through the patient's skin. Because of its strength, Duragesic is prescribed to relieve chronic pain only in people who have developed a tolerance to narcotics, such as morphine and demerol.

Two instruction sheets accompany each package of Duragesic: the package insert for prescribing physicians (the "package insert") and the Patient Instructions for Use pamphlet (the "instruction pamphlet"). Both the package insert and the instruction pamphlet contain warnings for use of Duragesic. In one section, the package insert warns that "Patients should be instructed to keep both used and unused systems out of the reach of children." In another section the package insert describes the proper method of disposal: "Used systems should be folded so that the adhesive side of the system adheres to itself and flushed down the toilet immediately upon removal."

The instruction pamphlet contains similar warnings. The first item on the instruction pamphlet is a boxed warning that states as follows:

> "Your doctor has prescribed DURAGESIC for your use only. Do not let anyone else use it. **Keep this and all other drugs out of the reach of children. When you remove a DURAGESIC you have worn, fold it with the sticky side inside and flush it down the toilet immediately.**"

Finally, the package insert warns that Duragesic can cause severe hypoventilation, i.e., depressed respiration, requiring medical treatment. Specifically, the package insert warns that "For management of hypoventilation immediate countermeasures include removing the DURAGESIC system and physically or verbally stimulating the patient. These actions can be followed by administration of a specific narcotic antagonist such as naloxone." The warnings do not state, how-

ever, that used patches·can cause hypoventilation. Nor do the warnings indicate that hypoventilation can cause death.

In 1992, three adults died after sucking or chewing on Duragesic patches, in an apparent effort to get "high." Defendants were aware of this fact at the time Duragesic was prescribed for Mr. Erony.

### B. Mr. Erony's Use of Duragesic

Mr. Erony suffers from several medical ailments, including Crohn's disease, pancreatitis, a partially removed stomach, and ulcer disease. As a result of these conditions, Mr. Erony suffers from severe, chronic pain. In search of an adequate painkiller, in March 1993 Dr. Maurice Beer, Mr. Erony's internist, referred Mr. Erony to Dr. Marcus at the New York Pain Clinic. Dr. Marcus prescribed Duragesic.

Because of Mr. Erony's dependency on narcotics, his dosage of Duragesic increased rapidly. From March until May 1993, Mr. Erony's dosage increased from 50 micrograms per hour to 275 micrograms per hour. To obtain his required dosage, Mr. Erony wore three Duragesic patches at a time. Mr. Erony was required to change the patches every 72 hours.

Neither Dr. Marcus nor Dr. Beer reviewed the package insert or the instruction pamphlet with Mr. Erony. Before he first used Duragesic, however, Mr. Erony reviewed both documents. In fact, at his deposition Mr. Erony testified to understanding that Duragesic should be flushed down the toilet and kept away from children. Nevertheless, Mr. Erony chose not to flush the used patches down the toilet because they were "too bulky." Instead, he disposed of the used patches by throwing them in the garbage. Mr. Erony also testified that he read the warnings concerning hypoventilation.

### C. Alex Erony

Alex was born in 1979. His parents married and divorced twice, the final separation occurring in 1990. At that time, Ms. Dellacorte, Alex's mother, moved to Hawaii. Alex shuttled between Hawaii and New York, primarily receiving his schooling through a home school·program. Ultimately, Alex decided that he would prefer to live in New York. Thus, in March 1993, Alex returned to New York to live with Mr. Erony.

Shortly thereafter, Mr. Erony began using Duragesic patches. Mr. Erony testified at his deposition that he informed Alex that the patches contained a narcotic similar to morphine. Mr. Erony further testified that Alex was familiar with morphine because Mr. Erony explained all his medications to Alex. Mr. Erony found it difficult to apply and remove the Duragesic patches by himself; therefore, he asked Alex to help him with this process. After removing the patches, Mr. Erony would either throw them in the trash himself or he would have Alex dispose of the used patches.

### D. Alex's Death

On May 23, 1993, Mr. Erony asked Alex to help him change his Duragesic patch. At approximately 11:30 a.m., after the patches were changed, Mr. Erony gave Alex the used patches to throw away. Although Alex remained in the apartment, Mr. Erony does not know what happened during the next hour. At approximately 12:45 p.m., Alex sat in a chair in the living room and began watching a video. At 1:00 p.m., Mr. Erony heard Alex make a gasping noise. Mr. Erony approached Alex and found the Duragesic patches sticking out of Alex's mouth. Alex's face had turned blue and he was not breathing. Mr. Erony pulled the patches out of Alex's mouth and attempted CPR. According to Mr. Erony, Alex resumed breathing and his color returned. However, Alex remained unconscious.

At this point, Mr. Erony did not call the police or 911 to obtain medical attention for Alex. Instead, Mr. Erony threw the patches that he retrieved from Alex's mouth into a trash chute outside of his apartment. Mr. Erony explained in his deposition testimony that he threw the patches away because he

> "just wanted to get [the patches] out of the house. Frankly, I didn't want Alex to get in trouble. I didn't think this was a life threatening situation, and I didn't want any trouble or anything. I ·thought he would recover, and I just wanted them out.

I didn't want anything laying around of this incident."

At approximately 2:00 p.m., one hour after Alex had stopped breathing, Mr. Erony called 911, because he noticed that Alex's breathing was slowing down. When he returned to Alex after calling 911, Mr. Erony noticed blood coming from Alex's nose and mouth. EMS personnel arrived but pronounced Alex dead at 2:09 p.m. After conducting a brief search of the surrounding area, police recovered the Duragesic patches that Mr. Erony had thrown away.

## DISCUSSION

### A. Summary Judgment Standard

A court may grant summary judgment only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. See Fed. R.Civ.P. 56(c). Accordingly, the court's task is not to "weigh the evidence and determine the truth of the matter but [to] determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Summary judgment is inappropriate if, resolving all ambiguities and drawing all inferences against the moving party, there exists a dispute about a material fact "such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248–49, 106 S.Ct. at 2510–11 (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 159, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970)); see Bay v. Times Mirror Magazines, Inc., 936 F.2d 112, 116 (2d Cir.1991).

To defeat a motion for summary judgment, however, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). There is no issue for trial unless there exists sufficient evidence in the record favoring the party opposing summary judgment to support a jury verdict in that party's favor. Anderson, 477 U.S. at 249–50, 106 S.Ct. at 2510–11. As the Court held in Anderson, "if the evidence is merely colorable, or is not significantly probative, summary judgment may be grant-

ed." Id. at 249–50, 106 S.Ct. at 2510–11 (citations omitted).

In moving for summary judgment, defendants raise three arguments. First, defendants argue that the warnings included with each package of Duragesic were adequate as a matter of law. Second, defendants argue that, regardless of whether the warnings were adequate as a matter of law, Alex's death was not proximately caused by any flaw in the warnings. Third, defendants contend that the negligent infliction of emotional distress claim must be dismissed because Mr. Erony was not in the "zone of danger."

### B. Adequacy of Warnings

Under New York law, in bringing a failure to warn claim against a drug manufacturer, " 'a plaintiff must demonstrate that the warning was inadequate and that the failure to adequately warn of the dangers of the drug was a proximate cause of his or her injuries.' " Krasnopolsky v. Warner–Lambert Co., 799 F.Supp. 1342, 1346, (E.D.N.Y. 1992) (quoting Glucksman v. Halsey Drug Co., 163 A.D.2d 163, 553 N.Y.S.2d 724, 726 (1st Dep't 1990)). With respect to the adequacy of warnings on prescription drugs, the informed intermediary doctrine applies in New York. See, e.g., Bukowski v. Coopervision, Inc., 185 A.D.2d 31, 592 N.Y.S.2d 807, 809 (3d Dep't 1993); Glucksman, 553 N.Y.S.2d at 726. Under this doctrine, "[t]he manufacturer of a prescription drug has a duty to warn of all potential dangers which it knows or should know, and must take such steps as are reasonably necessary to bring that knowledge to the attention of the medical profession." Glucksman, 553 N.Y.S.2d at 726; see also Martin v. Hacker, 185 A.D.2d 553, 586 N.Y.S.2d 407, 409 (3d Dep't 1992), aff'd, 83 N.Y.2d 1, 607 N.Y.S.2d 598, 628 N.E.2d 1308 (1993). Generally, whether a warning is adequate is an issue of fact to be determined at trial. Bukowski, 592 N.Y.S.2d at 808; Oliver v. NAMCO Controls, 161 A.D.2d 1188, 556 N.Y.S.2d 430, 431 (4th Dep't 1990).

Here, I cannot conclude that the warnings at issue were adequate as a matter of law. It is true that the warnings included

with Duragesic were generally thorough. The warnings repeatedly provide that used Duragesic patches should be flushed down the toilet immediately. Similarly, the warnings repeatedly state that Duragesic patches should be kept away from children.

Nevertheless, a reasonable jury could find that the warnings were inadequate because they were incomplete. For instance, although the warnings discuss hypoventilation, they do not state that oral ingestion could result in death.[1] Furthermore, and perhaps most important, the warnings do not state that a narcotic residue remains on the patches after their use, nor do they give notice that even after being worn for more than 72 hours, the patches may contain a sufficient amount of narcotics to cause death if ingested. Plaintiff has submitted affidavits from Mr. Erony's treating physician, Dr. Beer, and an expert in pharmacology, Dr. Morris Zedeck. Dr. Beer attests that, from his reading of the package insert, he did not understand that a used patch contained any narcotic residue. Similarly, Dr. Zedeck states that, in his expert opinion, the warnings did not adequately inform users of the potential dangers from used patches. Finally, Mr. Erony testified at his deposition that he had no idea that used patches contained a narcotic residue. Because I cannot make credibility determinations on a motion for summary judgment, *see Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513; *United States v. Rem*, 38 F.3d 634, 644 (2d Cir.1994), these sworn statements raise material issues of fact as to the adequacy of the warnings. Specifically, a factual question remains as to whether defendants adequately warned users of the potential dangers from used patches.

### C. *Proximate Cause*

██ To constitute proximate cause, an inadequate warning must be a *substantial cause* of the events leading to the injury. *See Derdiarian v. Felix Contracting Corp.*, 51 N.Y.2d 308, 434 N.Y.S.2d 166, 169, 414 N.E.2d 666, 670 (N.Y.1980). An act cannot be the "substantial cause" if the injury would

have occurred regardless of the content of defendant's warning. *See Elsroth v. Johnson & Johnson*, 700 F.Supp. 151, 166 (S.D.N.Y. 1988). Similarly, an inadequate warning cannot be the substantial cause of an injury if an intervening act occurs that is "of such an extraordinary nature or so attenuates defendant's negligence from the ultimate injury that responsibility for the injury may not be reasonably attributed to the defendant." *Kush v. City of Buffalo*, 59 N.Y.2d 26, 462 N.Y.S.2d 831, 835, 449 N.E.2d 725, 729 (N.Y. 1983). Nevertheless, when the intervening act is a natural and foreseeable consequence of defendant's negligent act, liability exists. *Id.*

██ Even when an injury results from a misuse of a product, proximate cause may exist. If a particular way of misusing a product is reasonably foreseeable, then a manufacturer's failure to warn of potential dangers from that misuse may be the proximate cause of a subsequent injury. *See Cramer v. Toledo Scale Co.*, 158 A.D.2d 966, 551 N.Y.S.2d 718, 719 (4th Dep't 1990). Whether a particular way of using or misusing a product is reasonably foreseeable is ordinarily a question for the jury. *See Johnson v. Johnson Chemical Co.*, 183 A.D.2d 64, 588 N.Y.S.2d 607, 610 (2d Dep't 1992).

Defendants argue that three events that preceded Alex's death constituted superseding causes: (1) Mr. Erony disregarded the warnings by handing the used patches to Alex to throw away; (2) Alex misused the patches by sucking on them to get high; and (3) Mr. Erony waited one hour before calling 911 to protect himself and Alex. Based on the well-established New York case law, however, I must find that issues of fact exist as to events 1 and 2 above. Event 3 is not a superseding cause as a matter of law.

██ First, issues of fact exist as to Mr. Erony's actions. Mr. Erony ignored the warnings, which plainly stated that used Duragesic patches should be flushed down the toilet, and handed Alex the used patches and instructed him to throw them in the garbage.

---

[1]. Notably, another patch manufactured by defendant Alza, Nicoderm, warns that oral ingestion

can cause death.

In so doing, Mr. Erony also ignored the plain warning that Duragesic patches should be kept away from children. Mr. Erony testified, however, that he believed that the used patches were nothing more than "harmless debris." He further claims that he never would have given the patches to Alex had he known that they contained a narcotic residue.

Although it is a close call, I must find that a reasonable jury could find that Mr. Erony would not have given the used patches to Alex had he been adequately warned about the risks involved. On the one hand, having read the warnings, Mr. Erony should have known that used patches were potentially dangerous—hence, the instruction that they should be flushed down the toilet immediately. On the other hand, Mr. Erony's testimony that he did not know that used patches were dangerous is supported by Dr. Beer's affidavit. Thus, a reasonable juror could find that the instruction to flush used patches down the toilet could have been intended to prevent less serious matters, such as irritation of the skin from inadvertent contact. Thus, I cannot determine that Mr. Erony's actions were a superseding cause as a matter of law.

■ Second, issues of fact remain as to whether Alex's ingestion of the patches was a superseding cause. There is little doubt that Alex's death resulted from a misuse of the Duragesic patches. Furthermore, Alex's act can be characterized an intentional, criminal act. It is unclear, however, whether this misuse was foreseeable. In 1992, three adults died after ingesting the contents of Duragesic patches. Just as Alex, each adult appeared to suck on Duragesic patches while attempting to get high. Defendants had knowledge of these incidents prior to Alex's death and thus Alex's misuse of the patches may have been reasonably foreseeable. In that case, Alex's intentional act would not sever defendants' liability. *See Kush,* 462 N.Y.S.2d at 835, 449 N.E.2d at 729. Accordingly, whether Alex's misuse of Duragesic was a foreseeable misuse is a question best left for the jury. Indeed, a reasonable jury could find that if Mr. Erony had been adequately warned, Alex would not have been placed in a position where he was able to misuse the Duragesic, in the same manner in which others, known to defendants, had misused the product and died as a result.

■ Third, Mr. Erony's actions after discovering Alex are simply irrelevant to the issue of liability. Alex's injury occurred as soon as he ingested the contents of the Duragesic patches. Whether and to what extent Alex would have been injured had Mr. Erony called 911 immediately upon discovering Alex is plainly a question of fact and is related to the issue of damages rather than to the issue of liability.

In sum, factual issues remain as to whether this incident would have occurred regardless of the content of the warnings. Accordingly, defendants' motion for summary judgment on the issue of its duty to warn is denied.

### D. *Negligent Infliction of Emotional Distress*

■ Defendants also move for summary judgment on plaintiffs' claim for negligent infliction of emotional distress. This aspect of their motion is granted. Under New York law, a party may only recover for emotional damage resulting from witnessing an injury to an immediate family member if the alleged negligent act simultaneously exposes both the injured party and the plaintiff to an unreasonable risk of bodily injury or death. *Trombetta v. Conkling,* 82 N.Y.2d 549, 605 N.Y.S.2d 678, 679–80, 626 N.E.2d 653, 654–56 (1993); *Bovsun v. Sanperi,* 61 N.Y.2d 219, 473 N.Y.S.2d 357, 362, 461 N.E.2d 843, 848 (1984). If a plaintiff merely suffers emotional damage and was never in the "zone of danger," plaintiff cannot recover. *Trombetta,* 605 N.Y.S.2d at 680, 626 N.E.2d at 656; *Bovsun,* 473 N.Y.S.2d at 362, 461 N.E.2d at 848.

■ Here, Mr. Erony's emotional damage stems solely from finding Alex unconscious and witnessing his death. At no point was Mr. Erony in the zone of danger, as Mr. Erony does not allege that he was ever exposed to bodily injury or death from the alleged negligence that purportedly caused Alex's death. *See Bovsun,* 473 N.Y.S.2d at 362, 461 N.E.2d at 848. Accordingly, plain-

tiff's claim based on negligent infliction of emotional distress must be dismissed.

## CONCLUSION

For the reasons set forth above, defendants' motion for summary judgment is granted in part and denied in part. Counsel for the parties are to appear for a pretrial conference on January 12, 1995 at 2:15 p.m. in Courtroom 11A of the Courthouse at 500 Pearl Street.

·SO ORDERED.