**Natalie FIGUEROA, Plaintiff,**

v.

**BOSTON SCIENTIFIC CORPORATION, Defendant.**

**No. 00 Civ. 7922(DC).**

United States District Court, S.D. New York.

March 31, 2003.

Benedict P. Morelli & Associates by David S. Ratner, Esq., Martha M. McBrayer, Esq., New York City, for Plaintiff.

Kaye Scholer LLP by Steven Glickstein, Esq., Maris Veidemanis, Esq., Julie Bauman, Esq., New York City, for Defendant.

## MEMORANDUM DECISION

CHIN, District Judge.

In this products liability case, 51–year-old plaintiff Natalie Figueroa suffers from female stress urinary incontinence. Figueroa decided to undergo surgical implantation of a vaginal sling manufactured by defendant, Boston Scientific Corporation ("BSC"), called the ProteGen Collagen Impregnated Synthetic Sling (the "ProteGen sling"). Although the sling alleviated Figueroa's symptoms, it was subsequently removed due to severe erosion of the surrounding vaginal wall. Figueroa alleges that the ProteGen sling was defective and dangerous to the public and sues BSC for strict products liability and negligence.

BSC moves to exclude the testimony of plaintiff's experts and for summary judgment. For the reasons set forth below, the motion is denied in both respects.

## BACKGROUND

### A. *Facts*

Since the late 1980s, Figueroa has been suffering from female stress urinary incontinence. (Figueroa Dep. at 31). This condition is defined as "leakage of urine with sudden increases in intraabdominal pressure," such as coughing, laughing, or sneezing. (McBrayer Aff. Ex. 4; *see* Figueroa Dep. at 31, 34, 36; Favale Dep. at 30). Figueroa experienced bladder infections, had problems emptying her bladder, and regularly wore pads to address the leakage problem. (Figueroa Dep. at 36–37). After years of sporadic visits to her gynecologist and attempts to solve her incontinence with non-surgical treatments, such as muscle contraction exercises, Figueroa underwent surgery in 1995. (*Id.* at 31, 34, 36–37). She had a laparoscopic bladder neck suspension, during a vaginal hysterectomy, that temporarily alleviated her stress incontinence. (*Id.* at 39, 41; Favale Dep. at 28; O'Hea Affirmation Ex. C). Unfortunately, Figueroa's incontinence returned, and she was referred to Dr. Dominic C.P. Favale in approximately 1997. (Figueroa Dep. at 39–41; Favale Dep. at 32).

After performing a full examination and battery of tests on Figueroa, Favale implanted the ProteGen sling on December 18, 1997. (Figueroa Dep. at 40–42; Favale Dep. at 31–32, 49). Approximately one month following the implantation of the ProteGen sling, Figueroa started experiencing chronic vaginal discharge. (Figueroa Dep. at 57–59). Then, in April 1999, she experienced bleeding and was subsequently diagnosed with vaginal erosion. (*Id.* at 59–60; Favale Dep. at 70–71). Upon examination, Favale could see the material of the ProteGen sling through a hole in the vaginal tissue. (Favale Dep. at 79–81). Favale surgically removed the sling in May of 1999. (*Id.* at 72, 77–79).

Within days after explantation of the sling, Figueroa began to experience severe vomiting and dehydration, for which she was eventually hospitalized and put on intravenous fluids. (*Id.* at 85–86; Figueroa Dep. at 62–63, 73, 75). She was told that her gastrointestinal problems were caused by the antibiotics she was taking. (Figueroa Dep. at 63; *see* Favale Dep. at 85; Rosenblatt Dep. at 105). Despite her subsequent release from the hospital, Figueroa's gastrointestinal problems persisted. (Figueroa Dep. at 62–65, 72–75). Figueroa also suffered from sexual dysfunction, involving decreased sensitivity, loss of sensation, and discomfort following sexual activity. (*Id.* at 78, 103; McBrayer Aff. Ex. 12 at 4–5). Additionally, after the sling was removed, Figueroa's incontinence returned. (Figueroa Dep. at 72).

### B. *The ProteGen Sling*

The ProteGen sling was first released in 1997. The sling comes with a package insert containing instructions for use, details regarding potential complications—including "tissue erosion"—and a section on warranties that disclaims "any implied warranties of merchantability and fitness." (O'Hea Affirmation Ex. B). According to the description in the insert, the sling is made of a synthetic material that is impregnated with collagen and contains glycerol as a softening agent. (*Id.*).

In January of 1999, the ProteGen sling was voluntarily recalled by BSC. (Def.'s Reply at 5; O'Hea Affirmation Ex. C).

### C. *Experts*

Dr. Peter L. Rosenblatt is a urogynecologist who is board certified in obstetrics and gynecology. He specializes in disorders of the lower urinary tract in women. (Rosenblatt Dep. at 18). He is Director of the Division of Urogynecology and Reconstructive Pelvic Surgery at Beth Israel Deaconess Medical Center and Mount Auburn Hospital, and also an assistant professor at Harvard Medical School. (Rosenblatt Affirmation ¶ 1). As part of his practice, he has prescribed a variety of vaginal slings for his patients and has performed approximately 300 implantations. (*Id.* ¶¶ 13–15). Rosenblatt is also co-author of an article entitled *Suburethral Sling Complications: Recognition and Management* that was published in a journal called The Female Patient. This article discusses "innovative conservative and surgical methods to treat female stress urinary incontinence" and contains sections describing the variety of available slings as well as the problems of sling erosion. (McBrayer Aff. Ex. 4).

Dr. Favale is a board-certified urologist who treats female incontinence in his practice. (Favale Dep. at 4–5). He has experience with many different types of vaginal slings and has performed approximately 40–50 sling implantation procedures. (*Id.* at 7–9, 13).

Dr. Christopher D. Batich is an organic and physical chemist who is currently a professor in the materials science and engineering department at the University of Florida. (McBrayer Aff. Ex. 9). His expert report details his opinions regarding, *inter alia*, the properties of synthetic materials, of which some vaginal slings are made. (*Id.* Ex. 10). He also discusses the effects that different processing methods have on these materials and considers the behavior of the synthetics in the presence of glycerol and bovine collagen. (*Id.*).

### D. *Procedural History*

Figueroa filed the complaint in this action in the Eastern District of New York on June 5, 2000. On October 18, 2000, the action was transferred to this Court. The parties engaged in discovery, and this motion followed.

## DISCUSSION

BSC moves to exclude Figueroa's experts—Drs. Rosenblatt, Favale, and Batich—and for summary judgment. First, I address BSC's request to exclude Figueroa's experts. Second, I discuss its request for summary judgment.

### A. Exclusion of Expert Testimony

#### 1. Applicable Law

A witness qualified as an expert will be permitted to testify if his or her testimony " 'will assist the trier of fact to understand the evidence or to determine a fact in issue.' " *United States v. Lumpkin,* 192 F.3d 280, 289 (2d Cir.1999) (quoting Fed.R.Evid. 702). To be admissible, expert testimony must be both relevant and reliable. *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

To be reliable, expert testimony must be based on sufficient facts or data, and it must be the product of reliable principles and methods properly applied. The trial court's task

> is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.

*Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). In other words, expert testimony should be excluded if it is "speculative or conjectural," or if it is based on assumptions that are " 'so unrealistic and contradictory as to suggest bad faith' or to be in essence an 'apples and oranges comparison.' " *Boucher v. U.S. Suzuki Motor Corp.,* 73 F.3d 18, 21 (2d Cir.1996) (quoting *Shatkin v. McDonnell Douglas Corp.,* 727 F.2d 202, 208 (2d Cir.1984)). An expert's opinion is inadmissible if it "is connected to existing data only by the *ipse dixit* of the expert," for a "court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997); *accord* Fed.R.Evid. 702 advisory committee's note (2000 Amendments) ("The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.' ") (quoting *Daubert v. Merrell Dow Pharms., Inc.,* 43 F.3d 1311, 1319 (9th Cir.1995)).

The trial court has latitude in deciding how to test an expert's reliability. *Daubert* listed a number of factors, but this "list of factors was meant to be helpful, not definitive." *Kumho Tire,* 526 U.S. at 151, 119 S.Ct. 1167. Hence, factors that a trial court *may* consider include, among others: whether a theory or technique relied on by an expert can be and has been tested; whether the theory or technique has been subjected to peer review and publication; whether there is a known or potential rate of error; whether the theory or technique has been generally accepted in the relevant community; whether the discipline itself lacks reliability; where an expert's methodology is experience-based, whether the methodology has produced erroneous results in the past and whether the methodology has been generally accepted in the relevant community; and whether an expert's method is of a kind that others in the field would recognize as acceptable. *Daubert,* 509 U.S. at 593, 113 S.Ct. 2786; *Kumho Tire,* 526 U.S. at 151, 119 S.Ct. 1167.

The reliability requirements do not preclude an expert from testifying on the basis of experience alone or in conjunction with other knowledge, training, skill, or education. *See* Fed. R. Evid 702 advisory committee's note (2000 Amendments) ("[E]xperience ... may [ ] provide a sufficient foundation for expert testimony."). But an expert basing his opinion solely on

experience "must do more than aver conclusorily that his experience led to his opinion." *Primavera Familienstifung v. Askin,* 130 F.Supp.2d 450, 530 (S.D.N.Y. 2001).

Courts have admitted expert testimony from medical doctors based on their examination and treatment of a patient's condition. *See, e.g., Santoro v. Signature Constr., Inc.,* No. 00 Civ. 4595(FM), 2002 WL 31059292, at *4 (S.D.N.Y. Sept. 16, 2002) ("[T]reating physicians have routinely been permitted to testify to determinations that they made in the course of providing treatment regarding the cause of an injury and its severity."); *Reyes v. Delta Dallas Alpha Corp.,* No. 92 Civ. 4418(AGS), 2000 WL 526851, at *2 (May 2, 2000) (admitting doctor's expert testimony "based on a number of factors, including his care and treatment of plaintiff, and his own practical experience"); *Canino v. HRP, Inc.,* 105 F.Supp.2d 21, 31 (N.D.N.Y. 2000) (allowing opinion "based on years of education, training and clinical experience ... [and] specific treatment of plaintiff"). The testimony of doctors has also been admitted despite a failure to rule out alternative causes: "[T]o the extent that ... physicians d[o] not fully consider and rule out all possible causes, such deficiencies ... generally go to the weight of the evidence," not admissibility, and weighing the evidence is a function for the jury. *Golod v. Hoffman La Roche,* 964 F.Supp. 841, 859 (S.D.N.Y.1997); *see also McCullock v. H.B. Fuller Co.,* 61 F.3d 1038, 1043–44 (2d Cir.1995); *Canino,* 105 F.Supp.2d at 30–31; *Santoro,* 2002 WL 31059292, at *4.

In addition to being reliable, expert testimony must be relevant. An expert opinion is relevant if it "will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Evid. 702; *see Daubert,* 509 U.S. at 591, 113 S.Ct. 2786 ("This condition goes primarily to relevance."). Ultimately, an expert's role is to assist the trier of fact by providing information and explanations.

■ The proponent of expert testimony must establish its admissibility by a preponderance of the evidence. *See Astra Aktiebolag v. Andrx Pharms., Inc.,* 222 F.Supp.2d 423, 487 (S.D.N.Y.2002) (citing Fed.R.Evid. 104(a) and *Bourjaily v. United States,* 483 U.S. 171, 175–76, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987)); *Cayuga Indian Nation v. Pataki,* 83 F.Supp.2d 318, 322 (N.D.N.Y.2000) ("[I]t is the proponent's burden ... to establish admissibility, rather than the opponent's burden to establish inadmissibility." (internal quotations omitted)); Fed.R.Evid. 702 advisory committee's note (2000 Amendments) ("[T]he proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence."). Rejection of expert testimony, however, is still "the exception rather than the rule," Fed.R.Evid. 702 advisory committee's note (2000 Amendments), and "the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system." *United States v. 14.38 Acres of Land,* 80 F.3d 1074, 1078 (5th Cir.1996); *see also Lippe v. Bairnco Corp.,* 288 B.R. 678, 685–87 (S.D.N.Y. 2003).

### 2. *Application*

BSC does not seem to dispute the qualifications of Figueroa's experts or the relevance of their testimony. It is the reliability of their opinions that is in dispute. I therefore address only the reliability of the expert testimony.

On the record before me, I conclude that the testimony of Drs. Rosenblatt, Favale, and Batich is sufficiently reliable to be admitted at trial. BSC's motion is therefore denied to the extent it seeks to exclude their testimony.

### a. *Rosenblatt*

BSC argues that Rosenblatt's testimony is inadmissible for three reasons: 1) he failed to rule out alternative causes for Figueroa's vaginal erosion, 2) he bases his opinion that the ProteGen sling caused Figueroa's injury "entirely on [the] inadmissible evidence" of a product recall, and 3) his opinion is speculative. (Def.'s Mem. at 6–10; Def.'s Reply at 2–7). Figueroa counters by asserting that Rosenblatt did rule out alternative causes, the product recall is admissible because it occurred before the explantation of Figueroa's sling, and therefore Rosenblatt's testimony should be admitted. BSC then points out that Rosenblatt ruled out alternative causes for Figueroa's vaginal erosion for the first time in an affirmation that was submitted with Figueroa's opposition to summary judgment. BSC claims that this affirmation contradicts Rosenblatt's prior deposition testimony and should therefore be disregarded.

■ First, even assuming that Rosenblatt did not rule out alternative causes for Figueroa's vaginal erosion that argument goes to the weight of the evidence rather than its admissibility. Hence, it does not operate to exclude Rosenblatt's testimony.

■ Second, even assuming that evidence of the ProteGen sling recall is inadmissible (and I will decide this issue later), Rosenblatt also based his expert opinion on other, admissible, evidence. For example, Rosenblatt reviewed Figueroa's medical records, Favale's office records, Figueroa's deposition transcript, Favale's testimony, and peer-reviewed medical literature. (Rosenblatt Dep. at 5–6, 42–43, 107–08; Rosenblatt Affirmation ¶¶ 2, 16, 18). He also has extensive experience as a urogynecologist, is board certified in urology and gynecology, and has performed numerous sling implantations on his own patients. (Rosenblatt Dep. at 18, 22, 42; Rosenblatt Affirmation ¶¶ 2, 13–15). BSC

points to a portion of Rosenblatt's deposition where he was specifically asked about language in the product recall notice and quotes that excerpt to support its claim that Rosenblatt's opinion is "based entirely on" the recall notice. (Def.'s Mem. at 9; *see* Rosenblatt Dep. at 110). The record shows otherwise.

■ Finally, as discussed above, Rosenblatt's opinion does not rely solely on any assumptions based on the recall notice. He reviewed witness depositions, medical records, and scientific literature in forming his expert opinion in this case. Additionally, BSC claims that reliance on the timing of the ProteGen sling implantation and Figueroa's subsequent symptoms renders Rosenblatt's opinion "inadmissible speculation." (Def.'s Reply at 7). Courts have previously admitted expert testimony where, as here, experts have relied, in part, on the temporal connection between an incident and an injury. *See Zuchowicz v. United States*, 140 F.3d 381, 385 (2d Cir.1998) ("His conclusion was based on the temporal relationship between the overdose and the start of the disease...."); *Canino*, 105 F.Supp.2d at 29–30 (admitting expert opinion that relies, in part, on "the temporal proximity between the ... incident and plaintiff's onset of [the disease]"). Because the record shows that Rosenblatt's opinion is based on more than his consideration of timing, BSC's argument that Rosenblatt's opinion is speculative has no merit.

I conclude that Rosenblatt's testimony is admissible. "[N]othing in the record indicates that the doctor would not testify with the intellectual rigor characteristic of other medical experts in his field." *Reyes*, 2000 WL 526851, at *2. I therefore deny BSC's motion to the extent it seeks to exclude Rosenblatt's expert testimony.

#### b. *Favale*

Favale is Figueroa's treating physician, but Figueroa intends to elicit his expert opinions as well. BSC argues that Favale's opinions as to causation are inadmissible due to 1) his failure to rule out alternative causes, and 2) his inference that the ProteGen sling caused vaginal erosion based on the very fact that erosion occurred.

As discussed above, a failure to rule out alternative causes is not determinative of admissibility of evidence but goes to weight, which is for a jury to decide.

■ Additionally, Favale based his expert opinion on a number of factors, not merely an inference of causation due to the occurrence of erosion. For example, Favale examined Figueroa, reviewed her medical records and medical history, performed extensive tests on her, and has significant experience as a board-certified urologist who has performed many vaginal sling implantations. (Favale Dep. at 4, 13–14, 26–35). "[A] treating physician often forms an opinion as to the cause of an injury or the extent to which it will persist in the future based upon his examination of a patient." *Santoro,* 2002 WL 31059292, at *4. As a result courts have allowed doctors to "testify at trial concerning any medical opinions that [they] formed during the course of . . . treatment with respect to [plaintiff's] injuries, their cause, and the extent of [plaintiff's] disability." *Id.*

Favale's testimony, as it is based on numerous factors, including his clinical experience and treatment of Figueroa, "appear[s] based on reasoned medical analysis," *Reyes,* 2000 WL 526851, at *2, and is admissible at trial. BSC's motion is therefore denied in this respect.

#### c. *Batich*

■ BSC claims that Batich's testimony is completely unsupported by facts or data, fails to fulfill four *Daubert* factors—testing, peer review and publication, error rate, and widespread acceptance—and should be excluded as unreliable. Figueroa, however, contends that Batich's opinion has a "strong basis" and that any criticisms of his testimony should be presented at trial. I conclude that Batich's testimony is sufficiently reliable to present to a jury.

Even assuming that Batich had no data to support his opinions, whether from his own testing or from others' data in the medical literature, such a contention is not fatal to the admissibility of his testimony. Batich has extensive experience, education, and knowledge in the materials science and engineering field and also reviewed relevant literature. (*See* McBrayer Aff. Exs. 9, 10). An expert may base his opinion on experience alone, and BSC's arguments implicate the weight of the evidence, rather than its admissibility. The "lack of textual authority for his opinion[ ] go[es] to the weight, not the admissibility, of his testimony." *McCullock,* 61 F.3d at 1044. Additionally, the fact that an expert "may have neglected to perform some 'essential' tests or measurements . . . go[es] to the weight of his testimony, not its admissibility." *Lappe v. Am. Honda Motor Co.,* 857 F.Supp. 222, 228 (N.D.N.Y.1994).

BSC's detailed analysis of how Batich's testimony fails to fulfill four *Daubert* factors is also not dispositive as to admissibility. While courts *may* consider the factors presented, they are "helpful, not definitive." *Kumho Tire,* 526 U.S. at 151, 119 S.Ct. 1167.

While Batich may not have physically examined or tested the ProteGen sling prior to writing his report, and while his opinion may not be grounded in a plethora of hard facts, data, studies, and scientific literature, it is certainly neither "novel scientific evidence," *Daubert,* 509 U.S. at 585, 113 S.Ct. 2786, nor "approaching the outer

boundaries of traditional scientific and technological knowledge." *Lappe,* 857 F.Supp. at 228; *cf. Mannix v. Chrysler Corp.,* No. 97 Civ.1944(ILG), 2001 WL 477291, at *6 (E.D.N.Y. Mar. 4, 2001) (excluding expert's testimony, which was "as thin as the homeopathic soup that was made by boiling the shadow of a pigeon that had been starved to death" (internal quotations omitted)). His opinion is based on familiarity with synthetic fibers, such as Dacron, as a result of years of education, training, and practical experience in the fields of organic and physical chemistry as well as materials science and engineering. *See, e.g., McCullock,* 61 F.3d at 1043–44. The proper course of action, therefore, is "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof[, which] are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert,* 509 U.S. at 596, 113 S.Ct. 2786.

I conclude that because Batich's testimony will assist the trier of fact to understand the issues, it is admissible, and BSC's motion is denied to the extent it seeks to exclude Batich's expert testimony.

## B. *Summary Judgment*

I conclude that BSC is not entitled to judgment as a matter of law. The motion for summary judgment is therefore denied.

### 1. *Summary Judgment Standard*

Summary judgment will be granted when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Accordingly, the Court's task is not to "weigh the evidence and determine the truth of the matter but [to] determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is inappropriate if, resolving all ambiguities and drawing all inferences against the moving party, there exists a dispute about a material fact "such that a reasonable jury could return a verdict for the nonmoving party." *Id.* 477 U.S. at 248, 106 S.Ct. 2505; *see Bay v. Times Mirror Magazines, Inc.,* 936 F.2d 112, 116 (2d Cir.1991).

To defeat a motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348. The nonmoving party "must present concrete particulars and cannot succeed with purely conclusory allegations." *Fitch v. R.J. Reynolds Tobacco Co.,* 675 F.Supp. 133, 136 (S.D.N.Y.1987) (citation omitted). There is no issue for trial unless there exists sufficient evidence in the record favoring the party opposing summary judgment to support a jury verdict in that party's favor. *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505. As the Court held in *Anderson,* "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* (citations omitted).

### a. *All Claims*

BSC asserts that all of Figueroa's claims should be dismissed on summary judgment. This contention is premised on BSC's argument that Figueroa has no evidence of proximate cause due to the inadmissibility of her experts' testimony. Because I have found the testimony of plaintiff's causation experts—Rosenblatt and Favale—admissible, this argument is moot.

### b. *Failure to Warn*

Under New York law, in bringing a failure to warn claim against a manufacturer,

" 'a plaintiff must demonstrate that the warning was inadequate and that the failure to adequately warn of the dangers . . . was a proximate cause of his or her injuries.' " *Krasnopolsky v. Warner–Lambert Co.*, 799 F.Supp. 1342, 1346 (E.D.N.Y.1992) (quoting *Glucksman v. Halsey Drug Co.*, 160 A.D.2d 305, 163 A.D.2d 163, 553 N.Y.S.2d 724, 726 (1st Dep't 1990)); *see also Anderson v. Hedstrom Corp.*, 76 F.Supp.2d 422, 439–44 (S.D.N.Y.1999).

With respect to the adequacy of warnings, the informed intermediary doctrine applies not only to prescription drugs, but also to medical devices. *See, e.g., Erony v. Alza Corp.*, 913 F.Supp. 195, 199 (S.D.N.Y. 1995); *Banker v. Hoehn*, 278 A.D.2d 720, 718 N.Y.S.2d 438, 440 (3d Dep't 2000); *see also Fane v. Zimmer, Inc.*, 927 F.2d 124, 129–30 (2d Cir.1991); *Sita v. Danek Med., Inc.*, 43 F.Supp.2d 245, 259–60 (E.D.N.Y. 1999). Under this doctrine, "[t]he manufacturer of a prescription drug [or medical device] has a duty to warn of all potential dangers which it knows or should know, and must take such steps as are reasonably necessary to bring that knowledge to the attention of the medical profession." *Glucksman*, 553 N.Y.S.2d at 726; *see also Sita*, 43 F.Supp.2d at 259–60. The manufacturer's duty of adequate warning is therefore fulfilled by providing sufficient information of the product's risk to the treating physician, rather than to the patient directly. *See Martin v. Hacker*, 83 N.Y.2d 1, 607 N.Y.S.2d 598, 601–02, 628 N.E.2d 1308 (1993).

Generally, whether a warning is adequate is an issue of fact to be determined at trial. *Fane*, 927 F.2d at 129; *Bukowski v. CooperVision, Inc.*, 185 A.D.2d 31, 592 N.Y.S.2d 807, 808 (3d Dep't 1993). "There are several important considerations that directly affect the adequacy of a warning, including the location and conspicuousness of the warning and the method in which the warning is communicated to the ulti-

mate user." *Anderson*, 76 F.Supp.2d at 440.

To constitute proximate cause, an inadequate warning must be a *substantial cause* of the events leading to the injury. An act cannot be the "substantial cause" if the injury would have occurred regardless of the content of defendant's warning. *See Erony*, 913 F.Supp. at 200. For example, if a treating physician is well aware of the risks of a medical device, independent of any warning by the manufacturer, "such knowledge constitutes an intervening event relieving the manufacturer of any liability to a patient under a failure to warn theory." *Banker*, 718 N.Y.S.2d at 440–41; *see also Fane*, 927 F.2d at 130 (finding adequate warning where physician was "fully aware" of risks of using medical device detailed in warnings).

While the chain of proximate causation may be broken when a plaintiff does not show that another warning would have made a difference, failure to read a manufacturer's warning, without more, is insufficient to defeat a failure to warn claim on summary judgment. *Anderson*, 76 F.Supp.2d at 442–43. "[A]n uncommunicated warning is no warning at all." *Baker v. St. Agnes Hosp.*, 70 A.D.2d 400, 421 N.Y.S.2d 81, 85 (1979). In fact, courts have specifically found that where a physician neglects to read product warnings, a failure to warn claim should not be dismissed. *See, e.g., Anderson*, 76 F.Supp.2d at 445 ("I see no basis for dismissing the claim as a matter of law based only on plaintiff's failure to read existing warnings."). Manufacturers of medical devices and pharmaceuticals may still be liable for failure to "employ other, more effective means of communicating [their] warning[s]," particularly if there is no evidence that the doctor would have remained unaware of the product's risks in the face of

such a tactic. *Baker*, 421 N.Y.S.2d at 86; *see also Anderson*, 76 F.Supp.2d at 440.

▮ BSC asserts that the ProteGen sling package insert provided sufficient warning that "tissue erosion" was a potential complication. According to defendant, because Favale did not read the package insert, Figueroa is unable to prove that another warning would have made any difference, therefore breaking the chain of proximate causation. Figueroa, on the other hand, argues that BSC's warning was not adequate and Favale's alleged failure to read the package insert does not negate proximate cause. I conclude that issues of fact exist precluding summary judgment on Figueroa's failure to warn claim.

First, it is not clear from the record whether Favale read the package insert for the ProteGen sling or not.

Q: Do you recall reading the instructions for use that came with the Prot[e]Gen material?

A: If I remember they used to have a colored, not even a pamphlet, it was like a two page instruction letter or whatever you want to call it. Little pictures there. I am sure I read that.

(Favale Dep. at 36–37). Immediately thereafter, the testimony quoted by BSC to indicate Favale's failure to read the ProteGen sling package insert reads as follows:

Q: Do you recall reading the materials that came with, the written materials that came with the vaginal sling or the vaginal sling as part of the Vesica Kit?

A: I don't ever recall seeing that material. No.

(*Id.* at 37). From Favale's deposition testimony, I conclude that issues of fact exist as to 1) whether Favale read the package insert for the ProteGen sling, 2) what the difference is between the ProteGen sling and the vaginal sling as part of the Vesica kit, and 3) which product was used with Figueroa, if there is a difference.

Second, BSC argues for dismissal of the failure to warn claim based on Favale's alleged failure to read the warning in the ProteGen sling package insert. Even assuming that Favale never read the insert, such a failure is not sufficient by itself to warrant summary judgment. BSC, as the manufacturer, has an obligation to "take such steps as are reasonably necessary to bring ... knowledge to the attention of the medical profession." *Baker*, 421 N.Y.S.2d at 85. For example, BSC could have implemented an alternate, more conspicuous type of warning that would have alerted Favale to the potential risks. The adequacy of a manufacturer's warning is a question of fact for the jury and is inappropriate for resolution on summary judgment.

Third, a reasonable jury could find that a different warning would have changed Favale's prescribing decision and prevented the alleged harm, thereby establishing proximate cause. A treating physician's knowledge of a product's risks, and his subsequent failure to inform the patient, have been considered intervening events that break the chain of proximate causation. *Fane*, 927 F.2d at 130; *Banker*, 718 N.Y.S.2d at 440–41. Conversely, Favale testified that he was unaware of the risk of vaginal erosion with the ProteGen sling, and if he had known about it, he would not have continued using the sling. (Favale Dep. at 36).

Because issues of fact exist and a reasonable jury could find that BSC's product warning was inadequate, I deny summary judgment on the failure to warn claim.

#### c. *Design Defect/Negligent Design*

BSC asserts that Figueroa's design claims should be dismissed on summary judgment. This contention is premised on

BSC's argument that Figueroa has no evidence of a design defect or negligent design due to the inadmissibility of Batich's testimony. Because I have found the testimony of plaintiff's design expert admissible, this argument is moot.

### d. *Implied Warranty*

In the sale of goods context, there is an implied warranty that the goods will be of merchantable quality. *Prohaska v. Sofamor, S.N.C.,* 138 F.Supp.2d 422, 448 (W.D.N.Y.2001). A seller's implied warranty of merchantability or fitness extends to parties who may reasonably "use, consume or be affected by the goods and who [are] injured in person by breach of the warranty." N.Y. U.C.C. § 2–318 (McKinney 1993).

> Where an article is of such a character that when used for the purpose for which it is made it is likely to be a source of danger to several or many people if not properly designed and fashioned, the manufacturer as well as the vendor is liable, for breach of . . . implied warranties, to the persons whose use is contemplated.

*Tinnerholm v. Parke, Davis & Co.,* 411 F.2d 48, 53 (2d Cir.1969) (internal quotations omitted). In the products liability context, however, disclaimers of warranties are generally not applicable to limit liability for defective products that cause personal injury. Restatement (Third) of Torts § 18 reporter's note cmt. a (2002). In fact, "a clear majority of courts follow this approach." *Id.* (citing cases).

BSC argues that Figueroa's implied warranty claim is invalid because BSC disclaimed "any implied warranties of merchantability or fitness" for the ProteGen sling. (O'Hea Affirmation Ex. B). In support of this assertion, however, BSC cites no authority. (Def.'s Mem. at 20). In response, Figueroa claims that the ProteGen sling warranty disclaimer is not applicable in this context, because manufacturers may not avoid liability when selling their products "as is" and the disclaimer does not apply to those without access to it.

Although Figueroa's arguments are distinguishable on the facts of this case, I conclude that BSC is not entitled to judgment as a matter of law. This is a products liability case in which an allegedly defective product may have caused Figueroa's injury. These circumstances describe exactly the type of case in which courts have found implied warranty disclaimers inapplicable and have declined to allow manufacturers to limit their liability. As such, I deny BSC's motion for summary judgment as to the breach of implied warranty claim.

### e. *Damage Claims*

BSC asserts that two of Figueroa's damage claims—her sexual dysfunction and gastrointestinal injury claims—should be dismissed due to lack of testimony by a treating physician or medical expert. BSC again contends that Rosenblatt's affirmation should be disregarded, based on the argument that "a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." *Raskin v. Wyatt Co.,* 125 F.3d 55, 63 (2d Cir.1997). By BSC's own admission, however, Rosenblatt "never testified about plaintiff's gastrointestinal injury claim," so his affirmation could not contradict his prior testimony and should not be disregarded. (Def.'s Reply at 13 n. 6). Figueroa contests BSC's assertions regarding the dismissal of these claims, although there are no citations to the record to support her position.

From the record before me, I conclude that there is sufficient testimony regarding Figueroa's sexual dysfunction and gas-

trointestinal injury claims to defeat summary judgment and bring these issues before a jury.

First, Rosenblatt states that "Ms. Figueroa's gastrointestinal problems stem from the use of antibiotics required for her post-operative treatment following the explantation of the ProteGen Sling device." (Rosenblatt Affirmation ¶ 25; *see* Rosenblatt Dep. at 105). Favale also testified that Figueroa "had some vomiting for which she went to the emergency room," which occurred "a couple weeks after explantation" and stated that she had elevated "theophylline levels," due to her being on the antibiotic Cipro. (Favale Dep. at 85–86). Finally, Figueroa's treating gastroenterologist, Dr. Paul A. Lebwohl, testified that on June 4, 1999, Figueroa came to his office complaining of "nauseousness and dry heaves" as well as "tremors and strange feelings." (Lebwohl Dep. at 21).

Second, as to Figueroa's sexual dysfunction claim, her treating psychiatrist, Dr. Goldstein, submitted a report on Figueroa. In the report, Goldstein states: "After removal of the vaginal sling . . . she has the residual gastrointestinal symptoms noted above and significant sexual dysfunction related to the vaginal insult. There has been a permanent loss of vaginal sensitivity, sexually pleasurable sensation and almost total loss of the ability to reach sexual orgasm." (McBrayer Aff. Ex. 12).

Construing the evidence in favor of Figueroa, as I must on a motion for summary judgment, I conclude that genuine issues of material fact exist as to her sexual dysfunction and gastrointestinal claims. BSC's motion for summary judgment on these two claims is therefore denied.

## CONCLUSION

For the foregoing reasons, defendant's motion is denied on all grounds. The parties shall appear for a pretrial conference in Courtroom 11A of the United States Courthouse at 500 Pearl Street, on April 4, 2003, at 11:30 a.m.

SO ORDERED.